CLINTON BROWN, Pro Se
16821 Edgar Street
Pacific Palisades, CA 90272
clinton@atlasinc.solar
310-487-6453

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON BROWN,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>EMIL ASSENTATO, TAX DEED ENTERPRISES LLC, STEVE WEERA TONASUT TRUST,<br><br>　　　　Defendant. | CASE NO. 2:23-cv-09272-MEMF-KS<br><br>**Opposition to Motion to Dismiss Under Rules 12(b)(1), 12(b)(6) and 9(b) or Statement Under Rule 12(e).**<br><br>**Judge:** Honorable Maame Ewusi-Mensah Frimpong<br><br>**Magistrate Judge:** Karen L. Stevenson<br><br>**Action Filed:** 04/20/2023<br><br>**Action Due:** 05/22/2023 |

### OPPOSITION TO MOTION TO DISMISS UNDER 12(B)(1), 12(B)(6), AND 9(B), OR STATEMENT UNDER 12(E)

**NOTICE TO THE COURT**, the Plaintiff asserts that it is impossible to engage in a meet and confer process[1] when the Defendants do not respond to a lawful summons. (Dk. 23-24). The record clearly shows that the Defendants received timely notice of the action, which is the *primary purpose* of F.R.C.P. 4. *(United Food & Commercial Workers Union, Locals 197, 373, 428, 588, 775, 839, 870, 1119, 1179*

---

[1] It is difficult to reason why the meet and confer obligation is exempted for some pro se parties and not others. The Plaintiff does not believe that the requirement is conducive to *F.R.C.P. 1* in this case, and frankly, puts the Plaintiff in an unprotected position (i.e., privileged communications). Furthermore, this case docket shows the consequence of such a requirement. (Dk 23); (L.R. 7-4 states that a Court "may" decline...). Plaintiff would rather flip the coin on merits than roll the dice on procedure.

*And 1532 Chartered by United Food & Commercial Workers International Union, Afl–Cio v. Alpha Beta Company, 736 F.2d 1371, 1382 (9th Cir. 1984)).* As such, after the entry of Docket No. 25 by the Clerk, it became the responsibility of the Defendants to either appear or file a Rule 4(m) motion. The Plaintiff had no intention of re-serving the Defendants unless otherwise directed by the Court. Now, 86 days after the filing of the Complaint, the Defendants have filed a response to the 21-day summons. Thus, this opposition.

## **INTRODUCTION**

The Plaintiff confirms the authenticity of the documents filed by the Defendant under F.R.E. 201. If the Court interprets these documents as extrinsic evidence based on the Defendants' alleged interpretation, the Plaintiff asks for the motion to be converted to a motion for summary judgment under Rule 12(d).

> "Plaintiff alleg*es* a partnership by an "operating agreement" made Oct. 22, 2020, with and between himself and defendants Emil Assentato ("Emil") and Tax Deed Enterprises LLC ("TDE"), involving intentions for land then owned by TDE. (Complaint p 2:20-23; 3:1-2)." [2]

As such, the reference to the Operating Agreement dated 10/22/2020 and Amended Operating Agreement dated 01/18/2022 are submitted to the Court under F.R.C.P. 10(c) in response to Docket 26-1, 2, lines 8-9.

> "So, conclusively, neither loan obligation, nor the purchase money deed of trust, of Atlas LLC, has a "family resemblance" to a regulated security, under the Securities Act." (Dk. 26-1, 4, lines 26-28).

We agree that neither has a "family resemblance," *but* that makes it more likely that it is indeed a security. (*Reves v. Ernst Young, 494 U.S. 56, 67, B, 110 S. Ct. 945 (1990)).*

---

[2] The Atlas, LLC, Operating Agreement § II.A (Oct. 22, 2020); The Atlas, LLC, Amendment to Operating Agreement (Jan. 18, 2022), Dk. 27, 13-37.

Plaintiff "Brown" alleges that it was "HE" who purchased the Property on Dec. 18, 2020, a 50% interest in the Property. (Complaint 2:3-5; p 2:25-26). However, RJN #2, supra, the Grant Deed, shows that Atlas LLC alone was the sole purchaser and sole owner, itself alone purchasing from TDE. (Dk. 26-1, 6, lines 24-27).

[He's either] business in his individual capacity or he is not. *(Walkovszky v. Carlton, 18 N.Y.2d 414, 419, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966); (Leading Mfg. Sols., LP v. Hitco, Ltd., No. 15cv1852-LAB (PCS), 2018 U.S. Dist. LEXIS 44803 (S.D. Cal. 2018)).* The Plaintiff is, and thus no corporate veil exists, *or can exist*, in the current controversy. This must be to "prevent fraud or achieve equity." *Id.*

## STANDING

To establish standing to sue in Federal court, a Plaintiff must show that it has suffered a concrete and particularized injury, one that is both traceable to the Defendant and redressable by a Court Order. *(United States v. Texas, No. 22-58, 599 U.S. ___ (June 23, 2023) (Gorsuch, J., concurring) (citing Lujan v. Defenders of Wildlife, 504 U. S. 555, 560–561 (1992)).* To survive a motion to dismiss, a Complaint must contain sufficient factual matter . . . to state a claim for relief that is plausible on its face. *(Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).* This standard generally only requires a short and plain statement of the claim showing that the pleader is entitled to relief. Moreover, F.R.C.P. 9(b) states that an allegation of fraud or mistake must state with particularity the circumstances constituting fraud. Specifically, the circumstances required by F.R.C.P. 9(b) are the "who, what, when, where, and how" of the fraudulent activity. *(Novobilski v. Specialized Loan Servicing, LLC, No. 2:22-cv-00147-MEMF-MAR, 2022 U.S. Dist. LEXIS 148499 (C.D. Cal. Aug. 16, 2022)*

*(citing Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1106 (9th Cir. 2003); Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993)).*

| Requirement* | Details | Page Number and Line |
|---|---|---|
| Who | Emil Assentato, Tax Deed Enterprises LLC, Steve Weera Tonasut Trust (Defendants) | Page 1, lines 12-14; Page 2, lines 1-3 |
| What | Failure to disclose the transaction as an "investment contract," and thus a "security," leading to misrepresentation, fraud, and deceit | Page 2, lines 20-28; Page 3, lines 1-9 |
| When | On or before, October, 22, 2020, to February 1, 2022 | Page 2, lines 20-22; Page 3, lines 14-17 |
| Where | Los Angeles County, California; Property at 27250 Agoura Rd., Calabasas, CA 91302 | Page 2, lines 3-10 |
| How | Defendants employed capital in a common enterprise, relied solely on the Plaintiff's entrepreneurial capital for the generation of profits, and undercapitalized the development to the detriment of the Plaintiff | Page 3, lines 15-20; Page 4, lines 1-6 |
| Why | Money | |

*(Note: The particularity standards outlined in F.R.C.P. 9(b) are within the discretion of the Court to consider.)

The Defendants could certainly respond to the allegations, yet they have not addressed any of the claims put forth by the Plaintiff. Therefore, it remains unclear how specific the Defendants require these allegations to be, especially considering that none of the Plaintiff's claims have been given the due consideration that they warrant in a case of this nature. The Plaintiff has a legitimate Complaint, otherwise, *it wouldn't or shouldn't* be in front of this Court. Either way the assumption of truth is on the Plaintiff's account and the Defendant must prove that they did not break federal security laws. *It's as simple as that.*

Furthermore, the Defendants' undercapitalization of the enterprise created a

situation where the Plaintiff is unable to fulfill financial commitments. This has put the Plaintiff in a precarious position where the risk of losing the property to the Defendants is not just hypothetical, but imminent. This sequence of events has resulted in concrete, particularized harm to the Plaintiff, and the threat of additional harm is looming. *(Lujan v. Defenders of Wildlife, 504 U. S. 555, 560–561 (1992)).* Plaintiff's standing results from (1) a concrete and particularized injury in fact; *The property is not merely real estate but represents a significant equity investment. The undercapitalization and loss of the asset translates into a considerable financial setback and interrupts the Plaintiff's anticipated income from the equity investment, which effectively functions as a security*, (2) the injury can be traceable to the Defendants' actions; *failure to disclose the transaction as an "investment contract," and thus a "security," has led to misrepresentation, fraud, and deceit in the transaction,* (3) a favorable decision for the Plaintiff would result in a remedy for the wrong; *rescission of the Defendants' 50% and 15% ownership, respectively, in the real property obtained from violating security laws.* This isn't a *de minimis non curat lex* controversy, this is an alleged violation of Federal securities law and standing has been established by the Plaintiff.

## <u>SUBJECT MATTER JURISDICTION</u>

The starting point in every case involving construction of a statute is the language itself. *(Landreth Timber Co. v. Landreth, 471 U.S. 681, 685, II, 105 S. Ct. 2297 (1985)).* United States District Courts have almost exclusive jurisdiction over violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. *(15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa, respectively); (Morrison v. National Australia Bank Ltd., 561 U.S. 247, 254, para 2, 130 S. Ct. 2869 (2010); (Section 929P(b)(1) of the Dodd Frank Wall Street Reform and Consumer Protection Act, Public Law No. 111-203, 124 Stat. 1376, 1864 (2010)).* Thus, subject matter jurisdiction is established, *in this case.*

## <u>FEDERAL SECURITIY LAWS</u>

Together, the Securities Act of 1933, *48 Stat. 74, 15 U. S. C. §77a et seq.*, and the Securities Exchange Act of 1934, *48 Stat. 881, 15 U. S. C. §78a et seq.*, form the backbone of American securities law. *(Slack, 1, I.).* Congress enacted a definition of security sufficiently broad to encompass virtually any instrument that might be sold as an investment. *(Reves v. Ernst & Young, 494 U.S. 56, 61, para 1, 110 S. Ct. 945 (1990)).* Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face. *(SEC v. Zandford, 535 U.S. 813, 822, para 1, 122 S. Ct. 1899 (2002)).* The end to which Congress intends to accomplish, which is providing robust protections for investors and promoting transparency and fairness in financial markets, is treated as the controlling factor of the law. *(A. C. Frost & Co. v. Coeur D'Alene Mines Corp., 312 U.S. 38, 45, para 1, S. Ct. 414 (1941)).* The term security is defined in the Securities Act of 1933 and the Securities Exchange Act of 1934. *(Securities Act of 1933 § 2(a)(1), 15 U.S.C. § 77b(a)(1) (as amended through P.L. 117-263, enacted December 23, 2022); (Securities Exchange Act of 1934 § 3(a)(10) 15 U.S.C. § 78c(a)(10) (as amended through P.L. 117-328, enacted December 29, 2022).* The term security is used in slightly different formations, but virtually identical in meaning. *(SEC v. Edwards, 540 U.S. 389, 393, II. 124 S. Ct. 892 (2004) (citing Reves, supra, 61, n.1).* Any contract or action that involves exchanging a security or interest in a security for something of value is considered a sale or an offer to sell. *(Section 2(a)(3); (15 U.S.C. § 77b(a)(3)).* The term issuer means every person who issues or proposes to issue any security. *(Section 2(a)(4) (15 U.S.C. § 77b(a)(4)).* Interstate commerce refers to any communication involving securities that crosses state lines. *Section 2(a)(7); (15 U.S.C. § 77b(a)*; *(Tcherepnin v. Knight, 389 U.S. 332, 336, para 1, 88 S. Ct. 548 (1967)).* The term security means investment contract, but it is not defined by Congress. *(Edwards, supra).*

## INVESTMENT CONTRACT

The term investment contract under Federal securities law means, an investment (1) in a common venture premised on (2) a reasonable expectation of profits to be (3) derived solely from the entrepreneurial or managerial efforts of others. *(SEC v. W. J. Howey Co., 328 U.S. 293, 298-299, 301, 66 S. Ct. 1100, 1102-1104, 90 L. Ed. 1244, reh. denied 329 U.S. 819, 67 S. Ct. 27, 91 L. Ed. 697 (1946)).* A common enterprise is a venture in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment. *(Brodt v. Bache & Co., 595 F.2d, 460, para 6, (quoting Securities and Exchange Commission v. Glenn W. Turner Enterprises, 474 F.2d 476, 482 n.7 (9th Cir.), cert. denied, 414 U.S. 821, 38 L. Ed. 2d 53, 94 S. Ct. 117 (1973); (Mordaunt v. Incomco, 686 F.2d, 815, 817 (9th Cir.1982)).* It is not necessary that the funds of investors are pooled; what must be shown is that the fortunes of the investors are linked with those of the promoters, thereby establishing the requisite element of vertical commonality. *(United States v. Jones, 712 F.2d 1316, 1321 (9th Cir. 1983) (citing Mordaunt v. Incomco, 686 F.2d 815, 817 (9th Cir.1982); EI Khadem v. Equity Securities Corp., 494 F.2d 1224, 1229 (9th Cir.), cert. denied, 419 U.S. 900, 95 S.Ct. 188, 42 L.Ed.2d 146 (1974)).* It is immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. *(Howey, supra).* A security and thus an investment contract is a flexible rather than static principle, one that is capable of adaptation. *Id.* In searching for the meaning and scope of the word security in the Securities Act and the Securities Exchange Act, form should be disregarded for substance and the emphasis should be on economic reality. *(Tcherepnin, supra); (Howey); (Edwards); (Reves); (Jones); (Glenn); (Zandford); (Collecting cases).* Thus, a common enterprise exists when there's a direct correlation between the success or failure of the Plaintiff's efforts and the success or failure of the investment. *In this case*, the

Defendants control both outcomes, *at their discretion*, resulting in only detriment to the Plaintiff and a benefit to themselves.

Securities laws are meant to be flexible and remedial, not restrictive, to effectively combat fraud. The Acts set higher conduct standards in the securities industry and are not limited to common-law fraud doctrines. The equal sharing of risk of error is achieved by using a preponderance-of-the-evidence standard, which doesn't favor any side. *(Herman & Maclean v. Huddleston, 459 U.S. 375, 390, para 2, 382 103 S. Ct. 683, 1983)).* Given the broadly remedial purposes of Federal securities legislation, the burden of proof is reasonably imposed on an issuer who pleads exemption. *(SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953) (citing Schlemmer v. Buffalo, R. & P. R. Co., 205 U.S. 1, 10 (1907)); Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74, preamble (1933)).* Private contracts cannot supersede Federal security laws. *(Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S. Ct. 1917 (1989)).* An investment scheme promising a fixed rate of return can be an investment contract and thus a security subject to Federal security laws. *(Edwards, supra, 397).* The security in question also involved communications and instruments across state lines.

### SECURITIES LAW VIOLATION

The Securities Act of 1933 prohibits the offer as well as the sale of unregistered, non-exempt securities. Thus, the focus of inquiry should be on the need for the protections afforded by registration. *(SEC v. Ralston Purina Co., 346 U.S. 119, 127, para 1, 73 S. Ct. 981 (1953)).* The obvious opportunities for pressure and imposition make it advisable all parties are entitled to compliance with the Acts. *Id.* The law doesn't protect individuals from making bad investments, it protects individuals from bad actors.

The misappropriation theory holds that a person commits fraud in connection with a securities transaction if a fiduciary uses undisclosed information to their own

advantage in a securities transaction; it is defrauding the principal by taking exclusive use of that information. *(United States v. O'Hagan, 521 U.S. 642 652-653, 117 S. Ct. 2199 (1997)).* This action dupes the principal. *Id.* Thus, it is unlawful to use or employ, in connection with the purchase or sale of any security or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. *(Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) (as amended through P.L. 117- 328, enacted December 29, 2022)*. Nonpublic material confidential information is property of the business operation. *(Carpenter v. United States, 484 U.S. 19, 26, (1987) (citing Ruckelshaus v. Monsanto Co., 467 U. 8. 986, 1001-1004 (1984); (Dirks v. SEC, 463 U.S. 646, 658, n. 10 (1983); Board of Trade of Chicago v. Christie Grain & Stock Co., 198 U.S. 236, 250-251 (1905); ef. 5 U.S.C. §552(b)(4)).* Therefore, a person who trades on the basis of material, nonpublic information, in short, gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public. *(O'Hagan, supra).* There is no question that fraudulent uses of confidential information fall within § 10(b)'s prohibition if the fraud is "in connection with" a securities transaction. *Id.* The Defendants had a fiduciary-like relationship with the Plaintiff because the relationship was based upon trust and confidence. *(United States v. Kosinski, 976 F.3d 135, 146, para 1, (2d Cir. 2020)).* In an inside-trading case this fraud derives from the inherent unfairness involved where one takes advantage of information intended to be available only for a corporate purpose and not for the personal benefit of anyone. *Id.*

Furthermore, in one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also, in a broad sense every investor lends his money to a borrower who uses it for a price and is

expected to return it one day. *(Willamette Sav. & Loan, Div. of Am. Sav. & Loan v. Blake & Neal Fin. Co., 577 F. Supp. 1415 (D. Or. 1984) (citing C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc., 508 F.2d 1354, 1359, cert. denied, 423 U.S. 825, 96 S. Ct. 38, 46 L. Ed. 2d 40 (1975)). Iterum*, in searching for the meaning and scope of the word 'security" in the Acts, form should be disregarded for substance and the emphasis should be on economic reality. *(Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S. Ct. 548 (1967) (citing S. E. C. v. W. J. Howey Co., 328 U.S. 293, 298 (1946)).*

Courts of Appeals have long found it possible to separate factual from legal matters. *(Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc., 574 U. S. 318, 328 (2015)).* Because a purely legal question is, by definition, one whose answer is independent of disputed facts, factual development at trial will not change the District Court's answer. *(Dupree v. Younger, No. 22–210, slip op., 6, para 3. (U.S. May 25, 2023).* Granted, the District Court might backtrack, but if the question is purely legal, that is because of law books, not trial exhibits. *Id*. Thus, the two questions of law before this Court are: Was there an offer and sale of an investment contract, thus an unregistered security? Was there a fraudulent undercapitalization scheme in connection with the offer and sale of an unregistered security?

**THEREFORE**, as much as the Defendants want to *ipse dixit,* "no security… no security… no security…no security…" (Dk. 26-1, 4, lines 10-11). *Prima facia*, the law says otherwise. And "[u]nless a registration statement is in effect as to a security," it is unlawful "to sell such security." *§77e(a). (Slack, 6, para 4).* It [1934 Act] allows suits in connection with the purchase or sale of "any security," whether registered or not. *§78j. (Slack, 2, para 2).* The 1934 Act allows investors to recover for fraud in the sale of unregistered shares upon proof of scienter. *(Slack, 4, para 3).* This is simply a question of law, and this Court should answer.

"I, **Clinton Brown**, solemnly swear that I am submitting this filing with the Court, and that:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information."

"I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."

Clinton Brown                                      07/16/2023

**Limited Liability Company Agreement of
The Atlas, LLC
A Limited Liability Company**

**THIS OPERATING AGREEMENT** (this "Agreement") of The Atlas, LLC**,** (the "Company"), is executed and agreed to, for good and valuable consideration, by the undersigned members (the "Members").

## I.      Formation.

A.   <u>State of Formation</u>. This is a Limited Liability Company Operating Agreement (the "Agreement") for The Atlas, LLC, a Member-managed California limited liability company (the "Company") formed under and pursuant to California law.

B.   <u>Operating Agreement Controls</u>. To the extent that the rights or obligations of the Members or the Company under provisions of this Operating Agreement differ from what they would be under California law absent such a provision, this Agreement, to the extent permitted under California law, shall control.

C.   <u>Primary Business Address</u>. The location of the primary place of business of the Company is:

10226 Regent St, Los Angeles, California 90034, or such other location as shall be selected from time to time by the Members.

D.   <u>Registered Agent and Office</u>. The Company's initial agent (the "Agent") for service of process is Clinton Brown. The Agent's registered office is 10226 Regent St, Los Angeles, California 90034. The Company may change its registered office, its registered agent, or both, upon filing a statement with the California Secretary of State.

E. <u>No State Law Partnership</u>. No provisions of this Agreement shall be deemed or construed to constitute a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of or with any other Member, for any purposes other than state tax purposes.

II. **Purposes and Powers.**

A. <u>Purpose</u>. The Company is created for the following business purpose:

The Partnership's primary purpose is to provide working capital to complete the entitlement, rezoning of the property (legally described as TR=33128 LOT 0003 and FOR DESC SEE ASSESSOR'S MAPS POR OF SW 1/4 AND SE 1/4 SEC 25 T1N R18W), and to facilitate a sale to a developer of the 2 land parcels that the partnership owns (APN 2064-005-011 and APN 2064-005-015).

Emil Assentato, Tax Deed Enterprises, LLC may exercise an option to sell 50% of the partnership for $10,000,000 if Clinton Brown agrees to exercise this option. Both parties must agree to the option.

The property, TR=33128 LOT 0003 and FOR DESC SEE ASSESSOR'S MAPS POR OF SW 1/4 AND SE 1/4 SEC 25 T1N R18W), is deeded and owned by, The Atlas, a California Limited Liability Company. Clinton Brown owns 50%, Emil Assentato owns 30% and Tax Deed Enterprises, LLC owns 20% of said property in The Atlas, LLC partnership.

B. <u>Powers</u>. The Company shall have all of the powers of a limited liability company set forth under California law.

C. <u>Duration</u>. The Company's term shall commence upon the filing of an Articles of Organization and all other such necessary materials with the state of California. The Company will operate until terminated as outlined in this Agreement unless:

1. The Members vote unanimously to dissolve the Company;

2.      No Member of the Company exists, unless the business of the Company is continued in a manner permitted by California law;

3.      It becomes unlawful for either the Members or the Company to continue in business;

4.      A judicial decree is entered that dissolves the Company; or

5.      Any other event results in the dissolution of the Company under federal or California law.

**III.    Members.**

A.   <u>Members</u>. The Members of the Company (jointly the "Members") and their Membership Interest at the time of adoption of this Agreement are as follows:

Clinton Brown, 50%

Emil Assentato, 30%

Tax Deed Enterprises, LLC, 20%

B.   <u>Initial Contribution</u>. Each Member shall make an Initial Contribution to the Company. The Initial Contributions of each shall be as described in Attachment A, <u>Initial Contributions of the Members</u>.

No Member shall be entitled to interest on their Initial Contribution. Except as expressly provided by this Agreement, or as required by law, no Member shall have any right to demand or receive the return of their Initial Contribution. Any modifications as to the signatories' respective rights as to the receipt of their initial contributions must be set forth in writing signed by all interested parties.

C.   <u>Limited Liability of the Members</u>. Except as otherwise provided for in this Agreement or otherwise required by California law, no Member shall be personally liable for any acts, debts, liabilities or obligations of the Company beyond their respective Initial Contribution, including liability arising under a judgment, decree or order of a court. The Members shall look solely to the Company property for the return of their Initial Contribution, or value thereof, and if the Company property remaining after payment or discharge of the debts, liabilities or obligations of the Company is insufficient to return such Initial Contributions, or value thereof, no Member shall have any recourse against any other Member except as is expressly provided for by this Agreement or as otherwise allowed by law.

D.   <u>Death, Incompetency or Termination of a Member</u>. Should a Member die, be declared incompetent, or withdraw from the Company by choice, the remaining Members will have the option to buy out that Member's Membership Interest in the Company. Should the Members agree to buy out the Membership Interest of the withdrawing Member, that Interest shall be paid for equally by the remaining Members and distributed in equal amounts to the remaining Members. The Members agree to hire an outside firm to assess the value of the Membership Interest.

The Members will have 30 days to decide if they want to buy the Membership Interest together and disperse it equally. If all Members do not agree to buy the Membership Interest, individual Members will then have the right to buy the Membership Interest individually. If more than one Member requests to buy the remaining Membership Interest, the Membership Interest will be paid for and split equally among those Members wishing to purchase the Membership Interest. If all Members agree by unanimous vote, the Company may choose to allow a non-Member to buy the Membership Interest thereby replacing the previous Member.

If no individual Member(s) finalize a purchase agreement by 30 days, the withdrawing Member, or their estate, may dispose of their Membership Interest however they see fit, subject to the limitations in Section III (E) below. If a Member is a corporation, trust, partnership, limited liability company or other entity and is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

The name of the Company may be amended upon the written and unanimous vote of all Members if a Member withdraws, dies, is found incompetent or is terminated.

E.  <u>Creation or Substitution of New Members</u>. Any Member may assign in whole or in part its Membership Interest only after granting their fellow Members the right of first refusal, as established in Section III (D) above.

1.  *Entire transfer*. If a Member transfers all of its Membership Interest, the transferee shall be admitted to the Company as a substitute Member upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement. Such admission shall be deemed effective immediately upon the transfer, and, simultaneously, the transferor Member shall cease to be a Member of the Company and shall have no further rights or obligations under this Agreement.

2.  *Partial transfer*. If a Member transfers only a portion of its Membership Interest, the transferee shall be admitted to the Company as an additional Member upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement.

3.  Whether a substitute Member or an additional Member, absent the written consent of all existing Members of the Company, the transferee shall be a limited Member and possess only the percentage of the monetary rights of the transferor Member that was transferred without any voting power as a Member in the Company.

F. <u>Member Voting</u>.

    1.    *Voting power.* The Company's Members shall each have voting power equal to their share of Membership Interest in the Company.

    2.    *Proxies.* At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy shall be delivered to the other Members of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

G. <u>Duties of the Members</u>. The Members shall cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises. The Members also shall cause the Company to:

    1.    Maintain its own books, records, accounts, financial statements, stationery, invoices, checks and other limited liability company documents and bank accounts separate from any other person;

    2.    At all times hold itself out as being a legal entity separate from the Members and any other person and conduct its business in its own name;

    3.    File its own tax returns, if any, as may be required under applicable law, and pay any taxes required to be paid under applicable law;

    4.    Not commingle its assets with assets of the Members or any other person, and separately identify, maintain and segregate all Company assets;

    5.    Pay its own liabilities only out of its own funds, except with respect to

organizational expenses;

6.   Maintain an arm's length relationship with the Members, and, with respect to all business transactions entered into by the Company with the Members, require that the terms and conditions of such transactions (including the terms relating to the amounts paid thereunder) are the same as would be generally available in comparable business transactions if such transactions were with a person that was not a Member;

7.   Pay the salaries of its own employees, if any, out of its own funds and maintain a sufficient number of employees in light of its contemplated business operations;

8.   Not guarantee or become obligated for the debts of any other person or hold out its credit as being available to satisfy the obligations of others;

9.   Allocate fairly and reasonably any overhead for shared office space;

10.   Not pledge its assets for the benefit of any other person or make any loans or advances to any person;

11.   Correct any known misunderstanding regarding its separate identity;

12.   Maintain adequate capital in light of its contemplated business purposes;

13.   Cause its Members to meet or act pursuant to written consent and keep minutes of such meetings and actions and observe all other California limited liability company formalities;

14. Make any permitted investments directly or through brokers engaged and paid by the Company or its agents;

15. Not require any obligations or securities of the Members; and

16. Observe all other limited liability formalities.

Failure of the Members to comply with any of the foregoing covenants shall not affect the status of the Company as a separate legal entity or the limited liability of the Members.

H. Fiduciary Duties of the Members.

1. *Loyalty and Care.* Except to the extent otherwise provided herein, each Member shall have a fiduciary duty of loyalty and care similar to that of members of limited liability companies organized under the laws of California.

2. *Competition with the Company.* The Members shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company unless a majority, by individual vote, of the Members excluding the interested Member, consents thereto. The Members shall refrain from competing with the Company in the conduct of the Company's business unless a majority, by individual vote, of the Members excluding the interested Member, consents thereto. In the event that a Member is the sole Member of the Company, no vote shall be required.

3. *Duties Only to the Company.* The Member's fiduciary duties of loyalty and care are to the Company and not to the other Members. The Members shall owe fiduciary duties of disclosure, good faith and fair dealing to the Company and to the other Members. A Member who so performs their duties shall not

have any liability by reason of being or having been a Member.

4. *Reliance on Reports.* In discharging the Member's duties, a Member is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:

   i.   One or more Members or employees of the Company whom the Member reasonably believes to be reliable and competent in the matters presented.

   ii.  Legal counsel, public accountants, or other persons as to matters the Member reasonably believes are within the persons' professional or expert competence.

   iii. A committee of Members of which the affected Member is not a participant, if the Member reasonably believes the committee merits confidence.

I. <u>Waiver of Partition: Nature of Interest</u>. Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each Member hereby irrevocably waives any right or power that such Member might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. No Member shall have any interest in any specific assets of the Company.

J. <u>Compensation of Members</u>. The Members shall have the authority to fix the compensation of individual Members. All Members may be paid their expenses, if any, of attendance at meetings of the Members, which may be a fixed sum for attendance at each meeting of the Members or a stated salary as a Member. No such payment shall

preclude any Member from serving the Company in any other capacity and receiving compensation therefor.

K. <u>Members as Agents</u>. All Members are agents of the Company for the purpose of its business. An act of any Member, including the signing of an instrument in the Company's name, binds the Company where the Member executed the act for apparently carrying on the Company's business or business of the kind carried on by the Company in the ordinary course, unless the Member had no authority to act for the Company in the particular matter and the person with whom the Member was dealing knew or had notice that the Member lacked authority. An act of a Member binds the Company, however, even where the Member executed the act not apparently for carrying on the Company's business or business of the kind carried on by the Company in the ordinary course only if the act was authorized by the other Members.

## IV.   Accounting and Distributions.

A. <u>Fiscal Year</u>. The Company's fiscal year shall end on the last day of December.

B. <u>Records</u>. All financial records including tax returns and financial statements will be held at the Company's primary business address and will be accessible to all Members.

C. <u>Distributions</u>. Distributions shall be issued on an annual basis, based upon the Company's fiscal year. The distribution shall not exceed the remaining net cash of the Company after making appropriate provisions for the Company's ongoing and anticipatable liabilities and expenses. Each Member shall receive a percentage of the overall distribution that matches that Member's percentage of Membership Interest in the Company.

## V.   Tax Treatment Election.

A. <u>Tax Designation</u>. The Company has or will file with the Internal Revenue Service for treatment as a Partnership.

## VI.    Dissolution.

A.    <u>Limits on Dissolution</u>. The Company shall have a perpetual existence, and shall be dissolved, and its affairs shall be wound up only upon the provisions established in Section II (C) above.

Notwithstanding any other provision of this Agreement, the Bankruptcy of any Member shall not cause such Member to cease to be a Member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

Each Member waives any right that it may have to agree in writing to dissolve the Company upon the Bankruptcy of any Member or the occurrence of any event that causes any Member to cease to be a Member of the Company.

B.    <u>Winding Up</u>. Upon the occurrence of any event specified in Section II(C), the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. One or more Members, selected by the remaining Members, shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities of the Company and its assets, shall either cause its assets to be distributed as provided under this Agreement or sold, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided under this Agreement.

C.    <u>Distributions in Kind</u>. Any non-cash asset distributed to one or more Members in liquidation of the Company shall first be valued at its fair market value (net of any liability secured by such asset that such Member assumes or takes subject to) to determine the profits or losses that would have resulted if such asset were sold for such value, such profit or loss shall then be allocated as provided under this Agreement. The fair market value of such asset shall be determined by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) approved by the Members.

D. <u>Termination</u>. The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for under this Agreement and (ii) the Company's registration with the state of California shall have been canceled in the manner required by California law.

E. <u>Accounting</u>. Within a reasonable time after complete liquidation, the Company shall furnish the Members with a statement which shall set forth the assets and liabilities of the Company as at the date of dissolution and the proceeds and expenses of the disposition thereof.

F. <u>Limitations on Payments Made in Dissolution</u>. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of its Initial Contribution and shall have no recourse for its Initial Contribution and/or share of profits (upon dissolution or otherwise) against any other Member.

G. <u>Notice to California Authorities</u>. Upon the winding up of the Company, the Member with the highest percentage of Membership Interest in the Company shall be responsible for the filing of all appropriate notices of dissolution with California and any other appropriate state or federal authorities or agencies as may be required by law. In the event that two or more Members have equally high percentages of Membership Interest in the Company, the Member with the longest continuous tenure as a Member of the Company shall be responsible for the filing of such notices.

## VII.   Exculpation and Indemnification.

A. No Member, employee or agent of the Company and no employee, agent or affiliate of a Member (collectively, the "Covered Persons") shall be liable to the Company or any other person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered

Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

B.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement. Expenses, including legal fees, incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall be paid by the Company. The Covered Person shall be liable to repay such amount if it is determined that the Covered Person is not entitled to be indemnified as authorized in this Agreement. No Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions. Any indemnity under this Agreement shall be provided out of and to the extent of Company assets only.

C.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person as to matters the Covered Person reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

D.  To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of the Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

E.  The foregoing provisions of this Article VII shall survive any termination of this

Agreement.

## VIII.    Insurance.

The Company shall have the power to purchase and maintain insurance, including insurance on behalf of any Covered Person against any liability asserted against such person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under the provisions of Article VII or under applicable law. This is separate and apart from any business insurance that may be required as part of the business in which the Company is engaged.

## IX.    Settling Disputes.

All Members agree to enter into mediation before filing suit against any other Member or the Company for any dispute arising from this Agreement or Company. Members agree to attend one session of mediation before filing suit. If any Member does not attend mediation, or the dispute is not settled after one session of mediation, the Members are free to file suit. Any law suits will be under the jurisdiction of the state of California.

## X.    Independent Counsel.

All Members entering into this Agreement have been advised of their right to seek the advice of independent legal counsel before signing this Agreement. All Members and each of them have entered into this Agreement freely and voluntarily and without any coercion or duress.

## XI.    General Provisions.

A. Notices. All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and may be personally served or sent by

United States mail and shall be deemed to have been given when delivered in person or three (3) business days after deposit in United States mail, registered or certified, postage prepaid, and properly addressed, by or to the appropriate party.

B.  <u>Number of Days</u>. In computing the number of days (other than business days) for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any time period falls on a Saturday, Sunday or holiday on which national banks are or may elect to be closed, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or such holiday.

C.  <u>Execution of Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which shall together constitute one and the same instrument.

D.  <u>Severability</u>. The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

E.  <u>Headings</u>. The Article and Section headings in this Agreement are for convenience and they form no part of this Agreement and shall not affect its interpretation.

F.  <u>Controlling Law</u>. This Agreement shall be governed by and construed in all respects in accordance with the laws of the state of California (without regard to conflicts of law principles thereof).

G.  <u>Application of California Law</u>. Any matter not specifically covered by a provision of this Agreement shall be governed by the applicable provisions of California law.

H.  <u>Amendment</u>. This Agreement may be amended only by written consent of all the

Members. Upon obtaining the approval of any such amendment, supplement or restatement as to the Certificate, the Company shall cause a Certificate of Amendment or Amended and Restated Certificate to be prepared, executed and filed in accordance with California law.

I. <u>Entire Agreement</u>. This Agreement contains the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained.

IN WITNESS WHEREOF, the Members have executed and agreed to this Limited Liability Company Operating Agreement, which shall be effective as of October 20, 2020.

By: _____     Date: _____
    Clinton Brown

By: _____     Date: _____

    Emil Assentato

By: _____Date: _____
    Tax Deed Enterprises, LLC

# ATTACHMENT A
## *Initial Contributions of the Members*

The Initial Contributions of the Members of The Atlas, LLC are as follows:

Clinton Brown

Complete the entitlement, rezoning of the property (legally described as TR=33128 LOT 0003 and FOR DESC SEE ASSESSOR'S MAPS POR OF SW 1/4 AND SE 1/4 SEC 25 T1N R18W), and to facilitate a sale to a developer of the 2 land parcels that the partnership owns (APN 2064-005-011 and APN 2064-005-015).

Emil Assentato

The amount deposited into The Atlas, LLC account will be the remaining difference less any costs including Real estate taxes after the close of escrow for entitlement purposes. Consulting and advice on project entitlement and sale.

# Amendment to Limited Liability Company Agreement of The Atlas, LLC
# A Limited Liability Company

As of January 18, 2022, the contract entitled Limited Liability Company Agreement of The Atlas, LLC A Limited Liability Company between the following parties:

> The Atlas, LLC
> Tax Deed Enterprises
> Emil Assentato

"The following language" will be added to the original contract, and will read as follows:

Clinton Brown, as manager of The Atlas, LLC, has agreed to sell 15% interest in the properties owned by The Atlas, LLC to Steve Weera Tonasut. A Grant Deed will be prepared and executed to reflect that a 15% ownership interests in the following vacant lands, APN 2064-005-011 and APN 2064-005-015, are being sold to Steve Weera Tonasut for $100,000.00. Steve Weera Tonasut, will not be a member of The Atlas, LLC.

The ownership interest transferred shall be vested, "Steve Weera Tonasut, Trustee of the Tonasut Family Trust Dated June 14, 2004", recorded by a Grant Deed.

The Atlas, LLC members, following the sale shall be 35%, Clinton Brown, 30% Emil Assentato and 20% Tax Deed Enterprises. The Atlas, LLC, shall own 85% and Steve Weera Tonasut shall own 15% of APN 2064-005-011 and APN 2064-005-015.

All other provisions of the Operating Agreement remain the same.

These changes are the only changes to the original contract. The entire remainder of the original contract remains in full force. This Amendment shall be effective once signed by all parties.

This Amendment shall be signed by the following:

The Atlas, LLC

By: _____

Clinton Brown
1/18/2022 9:58:40 PM GMT

Clinton Brown
Manager

Date: <span style="color:blue">01/18/2022</span> _____

Tax Deed Enterprises

By: _____

Emil Assentato
1/19/2022 1:04:34 AM GMT

Emil Assentato
Member

Date: <span style="color:blue">01/19/2022</span> _____

By: _____

Emil Assentato
1/19/2022 1:04:37 AM GMT

Emil Assentato
Member

Date: <span style="color:blue">01/19/2022</span> _____

# Authenti**SIGN**®

## *Signing Certificate*

| | |
|---|---|
| **Certificate ID:** E2893AF4-ADB2-47C1-A45F-25BD3084EC4D | **Date:** 1/18/2022 9:56:59 PM GMT |

### *Signing Information:*

**Signing Name:** Clinton-Steve-AgouraHills
**ID:** E2893AF4-ADB2-47C1-A45F-25BD3084EC4D
**Status:** Document has been signed by all parties.
**Start Date:** 1/18/2022 9:56:59 PM GMT          **End Date:** 1/19/2022 1:04:39 AM GMT
**# Signers:** 2          **# Reviewers:** 0          **# CC:** 0
**Creator:** Clinton Brown          **Email:** clinton@brownrealtygrp.com
**IP Address:** 76.94.198.209
**Address:**

### *Document Information:*

**Document Name:** Clinton-Steve-AgouraHills          **Source:** Uploaded
**Document ID:** ED162BA0-81A7-4E14-8EBA-9A8826382E1A
**Pages:** 2          **# Signature blocks:** 3          **# Initial blocks:** 0

### *Participant Activity:*                              *Signature / Initials:*

**Name:** Clinton Brown          *Clinton Brown*          *CB*

**Email:** clinton@atlasinc.solar          **Type:** Remote Signer
**EULA/TOS/ABP/CCD:** Accepted: 1/18/2022 9:58:17 PM GMT [IP:76.94.198.209]
**Document:** Signed and Accepted – date/time: 1/18/2022 9:58:41 PM GMT [IP:76.94.198.209]

**Name:** Emil Assentato          *Emil Assentato*          *EA*

**Email:** eassentato@mac.com          **Type:** Remote Signer
**EULA/TOS/ABP/CCD:** Accepted: 1/19/2022 1:04:29 AM GMT [IP:68.197.220.89]
**Document:** Signed and Accepted – date/time: 1/19/2022 1:04:39 AM GMT [IP:68.197.220.89]



# *Signing Certificate*

| | | |
|---|---|---|
| **Certificate ID:** E2893AF4-ADB2-47C1-A45F-25BD3084EC4D | **Date:** | 1/18/2022 9:56:59 PM GMT |

---

**Agreement Between Parties / Terms of Service:**

## Terms Of Service

Authentisign is a service offered by Concepts In Data Management Inc. US. d.b.a. Instanet Solutions. This is a legal agreement, by and between You ('You' may be either an individual or a single entity) and Instanet Solutions for the sole purpose of use by You of the Authentisign service offered by Instanet Solutions (the 'Service'). Instanet Solutions and You may be referred to herein as the 'Parties'. When using the Service, You agree to be bound by and subject to any guidelines, policies, rules or additional terms applicable to the Service which Instanet Solutions may communicate to You or post from time to time on the Authentisign.com website. These guidelines, policies, rules or additional terms are considered included as part of this Authentisign Service End User License Agreement (this 'Agreement'). Instanet Solutions reserves the right to amend this Agreement from time to time and will post material changes to this Agreement on its web site. If you continue to use the Service once Instanet Solutions has published the changes to the Agreement, You will be deemed to have accepted and agreed to those changes.

If You are accessing the Service to view, edit, electronically sign or retrieve an electronic document that was made available to You by one of Instanet Solutions' other customers, You explicitly acknowledge and agree that: (i) You are using the Service for such purpose, (ii) recognize the Service provides a web based security service that enables users to verify the authenticity of documents, provide tamper detection, digitally sign, electronically date, time stamp and postmark, and store such documents, and (iii) the Service, together with the Adobe/GlobalSign CDS digital signature timestamp certification, is a qualified security procedure. In addition, You acknowledge and agree that your use of the Service, together with the Adobe/GlobalSign CDS digital signature timestamp certification, (i) is commercially reasonable under the circumstances for which You employ its use; (ii) is being applied by You in a trustworthy manner, and (iii) is being relied upon by You in a reasonable and good faith manner.

## End User License Agreement

**1. USER ACCOUNT, PASSWORD, AND SECURITY**
To open an account, you must complete the registration process by providing Concepts In Data Management Inc. US d.b.a. Instanet Solutions with current, complete and accurate information as prompted by the Service Order Registration Form or via phone to a Instanet Solutions customer support representative. You then will receive a password and an account first and last name. You are entirely responsible for maintaining the confidentiality of your password and account. Furthermore, you are entirely responsible for any and all activities that occur under your account. You understand and acknowledge that by opening an account and utilizing the Services (as defined below) you are agreeing to be bound by these Terms of Service (TOS) and thereby enter into an agreement with Instanet Solutions with respect thereto.
You agree to notify Instanet Solutions immediately of any unauthorized use of your account or any other breach of security.
BY CLICKING THE `I ACCEPT` BUTTON , YOU AGREE TO THE TERMS OF USE OF THE MRED FAX PLUS, TRANSACTION DESK, AUTHENTISIGN, AUTHENTISIGN2GO, INSTANET FAX, INSTANET FORMS, DOCBOX and DOCBOX2GO SERVICES, AND ALL WEB SITES RELATED THERETO (THE "SERVICES").

**2. USER PRIVACY**
It is Instanet Solutions' policy to respect the privacy of its users. Instanet Solutions will not monitor, edit, or disclose any personal information about you or your use of the Services, including its contents, without your prior permission unless Instanet Solutions has a good faith belief that such action is necessary to: (1) conform to legal requirements or comply with legal process; (2) protect and defend the rights or property of Instanet Solutions (3) enforce these TOS; or (4) act to protect the interests of its users or others. For more information, see the Services' Privacy Statement at http://www.instanetsolutions.com/privacy/
Some personal information you provide to Instanet Solutions may be stored outside of the country in which you reside.
You agree that Instanet Solutions may access your account, including its contents, as stated above or to respond to Services or technical issues.

**3. DATA STORAGE AND OTHER LIMITATIONS**
You agree that Instanet Solutions is not responsible or liable for the deletion or failure to store form data or other information.

**4. USER CONDUCT**
As a condition of your use of the Services, you warrant to Instanet Solutions that you will not use the Services for any purpose that is unlawful or prohibited by these TOS. Any unauthorized use of the Services, or the resale of its Services, is expressly prohibited. You agree to abide by all applicable local, state, national and international laws and regulations and are solely responsible for all acts or omissions that occur under your account or password, including the content of your transmissions through the Services. By way of example, and not as a limitation, you agree not to:
**Defame, abuse, harass, stalk, threaten or otherwise violate the legal rights (such as rights of privacy and publicity) of others. Publish, distribute or disseminate any inappropriate, profane, defamatory, infringing, obscene, indecent or unlawful material or information. Harvest or otherwise collect information about others, including email addresses, without their consent.** Transmit or upload any material that contains viruses, trojan horses, worms, time bombs, cancelbots, or any other harmful or deleterious programs. Transmit or upload any material that contains software or other material protected by intellectual property laws, rights of privacy or publicity or any other applicable law unless you own or control the rights thereto or have received all necessary consents. Interfere with or disrupt networks connected to the Services or violate the regulations, policies or procedures of such networks. Attempt to gain unauthorized access to the Services, other accounts, computer systems or networks connected to the Services, through password mining or any other means. Violate any applicable laws or regulations including, without limitation, laws regarding the transmission of technical data or software exported from the United States through the Services.
Interfere with another's use and enjoyment of the Services or another individuals' or entity's use and enjoyment of similar services. Instanet Solutions has no obligation to monitor the Services or any user's use thereof or retain the content of any user session. Instanet Solutions has no obligation to investigate a user's identity or verify the authenticity of a user's statements, including those made to open an account. However, Instanet Solutions reserves the right at all times to monitor, review, retain and/or disclose any information as necessary to satisfy any applicable



# *Signing Certificate*

| | | | |
|---|---|---|---|
| **Certificate ID:** | E2893AF4-ADB2-47C1-A45F-25BD3084EC4D | **Date:** | 1/18/2022 9:56:59 PM GMT |

**Agreement Between Parties / Terms of Service:**

law, regulation, legal process or governmental request.

**5. LINKS TO THIRD PARTY SITES**
THE LINKS INCLUDED WITHIN THE SERVICES MAY LET YOU LEAVE THE SERVICES WEB SITES ('LINKED SITES'). THE LINKED SITES ARE NOT UNDER THE CONTROL OF INSTANET SOLUTIONS AND INSTANET SOLUTIONS IS NOT RESPONSIBLE FOR THE CONTENTS OF ANY LINKED SITE OR ANY LINK CONTAINED IN A LINKED SITE, OR ANY CHANGES OR UPDATES TO SUCH SITES. INSTANET SOLUTIONS IS NOT RESPONSIBLE FOR WEBCASTING OR ANY OTHER FORM OF TRANSMISSION RECEIVED FROM ANY LINKED SITE. INSTANET SOLUTIONS IS PROVIDING THESE LINKS TO YOU ONLY AS A CONVENIENCE, AND THE INCLUSION OF ANY LINK DOES NOT IMPLY ENDORSEMENT BY INSTANET SOLUTIONS OF THE SITE OR ANY ASSOCIATION WITH THEIR OPERATORS.

**6. DISCLAIMERS/LIMITATION OF LIABILITY**
The information included in or available through the Services may include inaccuracies or typographical errors. Changes are periodically added to such information as deemed appropriate by Instanet Solutions and/or its respective suppliers may make improvements and/or changes in the Services at any time.
Instanet Solutions does not represent or warrant that the Services will be uninterrupted or error-free, that defects will be corrected, or that the Services or the server that makes them available, are free of viruses or other harmful components. Instanet Solutions does not warrant or represent that the use or the results of the use of the Services or the materials made available as part of the Services will be correct, accurate, timely, or otherwise reliable.
You specifically agree that Instanet Solutions shall not be responsible for unauthorized access to or alteration of your transmissions or data, any material or data sent or received or not sent or received, or any transactions entered into through the Services. You specifically agree that Instanet Solutions is not responsible or liable for any threatening, defamatory, obscene, offensive or illegal content or conduct of any other party or any infringement of another's rights, including intellectual property rights. You specifically agree that Instanet Solutions is not responsible for any content sent using and/or included in the Services by any third party.
INSTANET SOLUTIONS AND/OR ITS RESPECTIVE SUPPLIERS MAKE NO REPRESENTATIONS ABOUT THE SUITABILITY, RELIABILITY, AVAILABILITY, TIMELINESS, AND ACCURACY OF THE SERVICES FOR ANY PURPOSE. THE SERVICES ARE PROVIDED "AS IS". WITHOUT WARRANTY OF ANY KIND. INSTANET SOLUTIONS AND/OR ITS RESPECTIVE SUPPLIERS HEREBY DISCLAIM ALL WARRANTIES AND CONDITIONS WITH REGARD TO THE SERVICES, INCLUDING ALL IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT.
IN NO EVENT SHALL INSTANET SOLUTIONS AND/OR ITS SUPPLIERS BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, CONSEQUENTIAL DAMAGES OR ANY DAMAGES WHATSOEVER INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF USE, DATA OR PROFITS, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE USE OR PERFORMANCE OF THE SERVICES OR RELATED WEB SITES, WITH THE DELAY OR INABILITY TO USE THE SERVICES OR RELATED WEB SITES, THE PROVISION OF OR FAILURE TO PROVIDE SERVICES, OR FOR ANY INFORMATION, SOFTWARE, PRODUCTS, SERVICES AND RELATED GRAPHICS OBTAINED THROUGH THE SERVICES, OR OTHERWISE ARISING OUT OF THE USE OF THE SERVICES, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF INSTANET SOLUTIONS OR ANY OF ITS SUPPLIERS HAS BEEN ADVISED OF THE POSSIBILITY OF DAMAGES. BECAUSE SOME STATES/JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU. IF YOU ARE DISSATISFIED WITH ANY PORTION OF THE SERVICES, OR WITH ANY OF THESE TERMS OF USE, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE SERVICES AND THEIR RELATED WEB SITES.

**7. INDEMNIFICATION**
You agree to indemnify and hold Instanet Solutions, its parents, subsidiaries, affiliates, officers and employees, harmless from any claim, demand, or damage, including reasonable attorneys' fees, asserted by any third party due to or arising out of your use of or conduct on the Services.

**8. TERMINATION**
Instanet Solutions may terminate your access to any part or all of the Services and any related Services at any time, with or without cause, with or without notice, effective immediately, for any reason whatsoever.
If you wish to terminate your account, your only recourse is to discontinue the use of the Services.
Instanet Solutions shall have no obligation to maintain any content in your account or to forward any contract/transaction information to you or any third party.

**9. PARTICIPATION IN PROMOTIONS OF ADVERTISERS**
Any dealings with advertisers on the Services or participation in promotions, including the delivery of and the payment for goods and services, and any other terms, conditions, warranties or representations associated with such dealings or promotions, are solely between you and the advertiser or other third party. Instanet Solutions shall not be responsible or liable for any part of any such dealings or promotions.

**10. USE OF SERVICES**
If you are accessing the Instanet Solutions Services to view, sign or retrieve a document that was made available to you through the Services, Instanet Solutions grants you a limited license to access the Services solely to use and learn about the Services. Other than viewing, signing, modifying or retrieving such document, you may not modify, copy, distribute, transmit, display, perform, reproduce, duplicate, publish, license, create derivative works from, offer for sale, or use in any other way the Services or any information contained in, or obtained from, the Services without the express written consent of Instanet Solutions. Any and all unauthorized uses of the Services or the contents therein will terminate the limited license granted to you. Without Instanet Solutions' express written consent, you may not (a) use any automated means to access the



# *Signing Certificate*

| | | | |
|---|---|---|---|
| **Certificate ID:** E2893AF4-ADB2-47C1-A45F-25BD3084EC4D | | **Date:** 1/18/2022 9:56:59 PM GMT | |

**Agreement Between Parties / Terms of Service:**

Services or collect any information from the Services (including, without limitation, robots, spiders or scripts), (b) use the Services in any manner that could damage, disable, overburden, or impair the Services or interfere with any other user's use or enjoyment of the Services, or (c) from the Services' web sites, place pop-up windows over its pages, or otherwise affect the display of its pages.

**11. MODIFICATIONS TO TERMS OF SERVICES, MEMBER POLICIES**
Instanet Solutions reserves the right to change the TOS or policies regarding the use of the Services at any time and to notify you by posting an updated version of the TOS on this web site. You are responsible for regularly reviewing the TOS. Continued use of the Services after any such changes shall constitute your consent to such changes.

**12. GENERAL**
These TOS and the agreement entered into by you with Instanet Solutions pursuant hereto are governed by the laws of the Province of Ontario, and Canada. Use of the Services are unauthorized in any jurisdiction that does not give effect to all provisions of these TOS, including, without limitation, this paragraph. You agree that no joint venture, partnership, employment, or agency relationship exists between you and Instanet Solutions as a result of this agreement or use of the Services. Instanet Solutions' performance of this agreement is subject to existing laws and legal process, and nothing contained in this agreement is in derogation of Instanet Solutions' right to comply with governmental, court and law enforcement requests or requirements relating to your use of the Services or information provided to or gathered by Instanet Solutions with respect to such use. If any part of these TOS or the agreement between you and Instanet Solutions is determined to be invalid or unenforceable pursuant to applicable law including, but not limited to, the warranty disclaimers and liability limitations set forth above, then the invalid or unenforceable provision will be deemed superseded by a valid, enforceable provision that most closely matches the intent of the original provision and the remainder of the TOS and agreement shall continue in effect. Unless otherwise specified herein, these TOS and this agreement constitutes the entire agreement between the user and Instanet Solutions with respect to the Services (excluding the use of any software which may be subject to an end-user license agreement) and it supersedes all prior or contemporaneous communications and proposals, whether electronic, oral or written, between the user and Instanet Solutions with respect to the Services. A printed version of these TOS and this agreement and of any notice given in electronic form shall be admissible in judicial or administrative proceedings based upon or relating to these TOS and this agreement to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form. You and Instanet Solutions agree that any cause of action arising out of or related to the Services must commence within one (1) year after the cause of action arose; otherwise, such cause of action is permanently barred. The section titles in these TOS are solely used for the convenience of the parties and have no legal or contractual significance.

**13. LANGUAGE**
It is the express will of the parties that this agreement and all related documents have been drawn up in English. COPYRIGHT AND TRADEMARK NOTICES: All contents of the Services are: Copyright © 2010 Instanet Solutions Inc. and/or its suppliers, c/o Concepts in Data Management Incorporated, PO Box 220 Lambeth Station, London, Ontario N6P1P9 Canada. All information related to the Services, including, without limitation, text, graphics, web sites and other files, and the arrangement thereof, are copyrighted and Instanet Solutions reserves all rights associated with such copyrights.

**TRADEMARKS.**
The names, trademarks, service marks and logos appearing within or related to the Services may not be used in any advertizing or publicity, or otherwise to indicate Instanet Solutions' sponsorship or affiliation with any product, service, event or organization without Instanet Solutions' prior express written permission. Instanet Solutions' MRED FAX PLUS, TRANSACTIONDESK, AUTHENTISIGN, AS2GO, INSTANET FORMS, INSTANET FAX, DOCBOX and DOCBOX2GO and/or other Instanet Solutions products and Services referenced herein or within the Services are either trademarks or registered trademarks of Instanet Solutions.

Any rights not expressly granted herein are reserved.

## Agreement Between Parties
You are accessing the Authentisign Service (the "Service") to view, edit, electronically sign and retrieve an electronic document that was made available to you by one of Instanet Solutions' other customers. This is an agreement by and between or among you and the other parties to such electronic document. You explicitly acknowledge and agree that all parties to such electronic document have mutually agreed to the use of the Service and that you, together with such other parties: (i) are using the Service for such purpose, (ii) recognize the Service, in conjunction with the Adobe/GlobalSign CDS digital signature timestamp certification, provides a web based security service that enables users to verify the authenticity of documents, provide tamper detection, digitally sign, electronically date and time, and store such documents, and (iii) agree that the Service, together with the Adobe/GlobalSign CDS digital signature timestamp certification, is a qualified security procedure. In addition, you, together with each party to the electronic document, acknowledge and agree that your use of the Service, together with the Adobe/GlobalSign CDS digital signature timestamp, (i) is commercially reasonable under the circumstances for which you employ its use; (ii) is being applied by you in a trustworthy manner, and (iii) is being relied upon by you in a reasonable and good faith manner.
Last Update: 07212013



# *Signing Certificate*

| | | | |
|---|---|---|---|
| **Certificate ID:** | E2893AF4-ADB2-47C1-A45F-25BD3084EC4D | **Date:** | 1/18/2022 9:56:59 PM GMT |

**Consumer Consent Disclosure:**

## Consumer Consent Disclosure

By proceeding and selecting the "**I Agree**" toggle button option corresponding to the Consumer Consent Disclosure section on the Authentisign Signature Creation Wizard you are agreeing that you have reviewed the following consumer consent disclosure information and consent to transacting business electronically, to receive notices and disclosures electronically, and to utilize electronic signatures instead of using paper documents. This electronic signature service ("**Authentisign**") is provided on behalf of our client ("**Sender**") who listed with their contact information at the bottom of the Authentisign Signing Participant email ("**Invitation**") you received. The **Sender** will be sending electronic documents, notices, disclosures to you or requesting electronic signatures from you.

You are not required to receive disclosures, notices or sign documents electronically. If you prefer not to do so, you can make a request to receive paper copies and withdraw your consent to conduct business electronically at any time as described below.

**Scope of Consent**

You agree to receive electronic notices, disclosures, and electronic signature documents with all related and identified documents and disclosures provided over the course of your relationship with the **Sender**. You may at any point withdraw your consent by following the procedures described below.

**Hardware and Software Requirements**

To receive the above information electronically, you will need all of the following:

• a computer or tablet device with internet access
• a working individual email address
• a supported operating systems and browsers from list table below

| OperatingSystem | Microsoft Internet Explorer | Apple Safari | Mozilla® Firefox | Mobile Safari | Chrome |
|---|---|---|---|---|---|
| WindowsXPSP3 | 8.0 | 5.0 or higher | 23 or higher | N/A | 22,0 or higher |
| Windows Vista | 8.0, 9.0 | 5.0 or higher | 23 or higher | N/A | 22,0 or higher |
| Windows7/8 | 8.0, 9.0, 10 | N/A | 23 or higher | N/A | 22,0 or higher |
| MacOS X10.5 (Leopard™) | N/A | 5.0 or higher | 23 or higher | N/A | N/A |
| MacOS X10.6 (SnowLeopard™) | N/A | 5.0 or higher | 23 or higher | N/A | N/A |
| *Apple – IOS 5.0 or higher* | *N/A* | *N/A* | *N/A* | *5.0 or higher* | *28.0.1500.12 or higher* |

*JavaScript and Cookies mustbe enabled in the browser.*

**Requesting Paper Copies**

You have the ability to download and print or download any disclosures, notices or signed documents made available to you through **Authentisign** using the document print options located within the service. **Authentisign** can also email you a copy of all documents you sign electronically. You are not required to receive disclosures, notices or sign documents electronically and may request paper copies of documents or disclosures if you prefer. If you do not wish to work with electronic documents and instead wish to receive paper copies you can contact the **Sender** though **Authentisign** document signing interface or request paper copies by following the procedures described below. There could be fees associated with printing and delivering the paper documents.

**Withdrawal of Consent to Conduct Business Electronically**

Consent to receive electronic documents, notices or disclosures can be withdrawn at any time. In order to withdraw consent you must notify the **Sender**. You may withdraw consent to receive electronic notices and disclosures and optionally electronically signatures by following the procedures described below.

**Requesting paper documents, withdrawing consent, and/or updating contact information**

To request paper copies of documents, withdraw consent to conduct business electronically and receive documents, notices, or disclosures electronically or sign documents electronically please contact the **Sender** by sending an email to **Sender's** email address located at the bottom of the **Invitation** requesting your desired action. Use one of the following email subject lines and insert the associated text into the body of the email:

• Email Subject line**:** "Request for Paper Documents"

  Include your full name, email address, telephone number, postal address and the signing name found in the **Invitation** in the body of the email.

  *Note: There could be per page and delivery fees required by the **Sender** to send the paper documents.*

•Email Subject line: "Withdraw Consent to Conduct Business Electronically"

  Include your full name, email address, telephone number, postal address and the signing name found in the **Invitation** in the body of the email.



## *Signing Certificate*

**Certificate ID:** E2893AF4-ADB2-47C1-A45F-25BD3084EC4D          **Date:** 1/18/2022 9:56:59 PM GMT

**Consumer Consent Disclosure:**

•Email Subject line: "Update Contact Information"
 Include your full name, email address, telephone number, postal address and the signing name found in the **Invitation** in the body of the email.
 along with the requested change(s) to your contact information