**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE MAAME EWUSI-MENSAH FRIMPONG, U.S. DISTRICT JUDGE**

| | |
|---|---|
| **CLINTON BROWN,**<br>**Plaintiff,**<br>**v.**<br>**EMIL ASSENTATO, et al.,**<br>**Defendants.** | **Case No. CV 23-2972 MEMF (KSx)** |
| **CLINTON BROWN,**<br>**Plaintiff,**<br>**v.**<br>**CLARK R. TAYLOR,**<br>**Defendant.** | **Case No. CV 22-9203 MEMF (KSx)** |
| **CLINTON BROWN,**<br>**Plaintiff,**<br>**v.**<br>**STEVE SMEAD,**<br>**Defendant.** | **Case No. CV 23-2938 MEMF (KSx)** |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**MOTION HEARING**
**THURSDAY, SEPTEMBER 21, 2023**
**10:26 A.M.**
**LOS ANGELES, CALIFORNIA**

**MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
FEDERAL OFFICIAL COURT REPORTER

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

CLINTON BROWN
IN PRO SE
16821 Edgar Street
Pacific Palisades, California 90272
(310) 487-6453

**FOR THE DEFENDANTS EMIL ASSENTATO, TAX DEED ENTERPRISES, LLC, and STEVE WEERA TONASUT TRUST:**

FREDERICK J. HICKMAN
Attorney at Law
17602 17th Street, Suite 102
Tustin, California 92780
(714) 315-1565

**FOR THE DEFENDANT CLARK R. TAYLOR, AICP, THE LOS ANGELES COUNTY DEPARTMENT OF REGIONAL PLANNING:**

HURRELL CANTRALL, LLP
BY: JONATHAN FANG
Attorney at Law
725 South Figueroa Street, Suite 3800
Los Angeles, California 90017
(213) 426-2000

**FOR THE DEFENDANT STEVE SMEAD (VIA VIDEOCONFERENCE):**

LAW OFFICES OF DAVID YOUNG
BY: DAVID YOUNG
Attorney at Law
12400 Wilshire Boulevard, Suite 360
Los Angeles, California 90025
(310) 575-0308

THURSDAY, SEPTEMBER 21, 2023; 10:26 A.M.

LOS ANGELES, CALIFORNIA

-oOo-

THE COURTROOM DEPUTY: Calling Item No. 6 on the calendar, LA CV 23-02972 MEMF, Clinton Brown versus Emil Assentato.

Counsel, state your appearances.

MR. HICKMAN: Good morning, Your Honor. Fred Hickman for the defendants Steven Weera Tonasut, Emil Assentato, and Trust *[sic]* Deed Enterprises.

THE COURT: Thank you.

MR. BROWN: Clinton Brown for Clinton Brown.

THE COURT: Thank you.

Okay. The parties may be seated.

And counsel, your name again?

MR. HICKMAN: Fred, F-r-e-d, Hickman, H-i-c-k-m-a-n.

THE COURT: Okay. And have you already provided the clerk with your information? Because I don't see you -- oh. I think I was looking at the wrong one.

Hickman. Okay. We have it. Great. Thank you.

Okay. So thank you, to both of you, for appearing for this hearing. I also thank you for your patience and in terms of scheduling this hearing and getting this on calendar in light of the Court's busy calendar.

Mr. Brown, I did want to advise you that we realize

that we had one of your requests pending regarding the IFP and that's now been granted. It will probably hit the docket shortly.

Okay. So with that, did both of you receive the Court's tentative ruling via e-mail?

10:27AM

MR. HICKMAN: Yes, Your Honor.

MR. BROWN: Yes, Your Honor.

THE COURT: Okay. And so I think it's explained at the top of the tentative, but I'll just reiterate that the tentative is truly that, it's the Court's tentative ruling. It's intended to be helpful to the parties in making their arguments so you have a sense of what the Court is thinking and the direction the Court is going. But my mind remains open, that's why I'm still having this hearing. So you shouldn't feel like I cannot be persuaded to take another direction than what's in the tentative. But I do find it's helpful for the parties to have a sense of what the Court is thinking.

10:28AM

10:28AM

Okay. So with that, let's start with the motion to dismiss. And, Mr. Hickman, since that's your motion, I will let you be heard first and then we'll hear from Mr. Brown.

10:28AM

MR. HICKMAN: Thank you, Your Honor.

We have, as the tentative notes, as you note, two motions to dismiss. One is for Steven Weera Tonasut. So if I may address that one first.

THE COURT: You may.

10:29AM

MR. HICKMAN: I agree that Rule 9(b) is not satisfied in a fraud pleading. The who, what, when, where, why, the Complaint is silent about misrepresentations, falsehoods, reliance on falsehoods, resulting damages from falsehoods, and that's true for a fraud case generally that's failed any fraud pleading standard.

The Court didn't need to reach it, it seems, or may not need to reach it. It did not -- the Court did not reach the heightened, the more heightened fraud pleading standards required for a claim of violation of federal securities laws. As I read the cases, it's an even more heightened fraud pleading requirement for federal securities law violations than it is under standard Rule 9(b) for fraud.

But I agree on the Rule 9(b). And perhaps the Court doesn't need to reach the even higher standard since 9(b) was not met.

THE COURT: And what would you point to as your authority for -- your primary authority for the idea that the pleading standard is even higher for securities?

MR. HICKMAN: If I may grab the brief --

THE COURT: Yes, please.

MR. HICKMAN: -- because I read the cases.

Your Honor, one of the cases that I briefed in both the motion and the reply is -- in the reply, it's at -- for Mr. Tonasut, it's at page 5, line -- starting at line 28 -- or

lines 23 through 28. *ScripsAmerica, Incorporated, versus Ironridge Global LLC*, 56 F.Supp.3d 1121, 1136.

THE COURT: Do you have any binding authority that indicates that the pleadings standard for a securities law violation is higher than the Rule 9 pleading standard?

MR. HICKMAN: Your Honor, no, I -- I can't say that I do at the moment. If that's not set forth in the *ScripsAmerica* case and others like it, then it is not a -- it would not be a higher standard.

But I -- I understood in my reading of the case law that, under Rule 9, the -- the Private Securities Litigation Reform Act, the PSLRA, 15 U.S.C. -- it's cited in *ScripsAmerica* -- 15 U.S.C., Section 78u-4. I had read that to mean it was a higher standard because the Rule 9 fraud pleading standard has existed since Rule 9 -- I didn't check it -- but the 1930s, maybe, probably earlier, going back to the beginnings.

And so because of the -- the problems presented by excessive securities complaints, complaints that seem to be burdening the system, Congress, as I read it, enacted that Private Securities Litigation Reform Act to -- to, like, make really, really sure the fraud pleading would have to be very, very good.

And so that's all I -- I can say.

THE COURT: Understood.

Anything else?

MR. HICKMAN: Yes.

For Steven Weera Tonasut, I believe, the focus, as I briefed but want to mention, is that Steven Weera Tonasut sold nothing to Clinton Brown. And Clinton Brown -- on the pleading and in the judicial notice, Clinton Brown bought nothing from Mr. Tonasut.

He -- Mr. Brown did not buy an investment contract from Mr. Tonasut. Mr. Brown didn't buy land from Mr. Tonasut. Mr. Brown did not buy a promissory note from Mr. Tonasut. Mr. Brown didn't buy a security from Mr. Tonasut.

Mr. Tonasut made a loan, and Brown and Atlas, LLC, signed a promissory note taking Mr. Tonasut's money from him, from him, money flowing from Tonasut to Brown and Atlas, LLC, as purchase money secured by a deed of trust, a normal encumbrance, that Atlas, LLC, gave to secure the promissory note for purchase money.

THE COURT: And do you -- can you address -- as you saw in the tentative, the -- the Court's determination was that Mr. Brown had properly pled a security because he had properly pled that the arrangement between the three entities was an investment contract.

So I appreciate your describing that, in your view, the relationship between Mr. Tonasut and Mr. Brown was that of a loan. But can you address -- given that the Court is to

view -- assume that the facts as pled are true, that those facts would make out an investment contract and, therefore, a security. Can you address that?

MR. HICKMAN: Mr. Brown's concept, without pleading facts to show it, is that they were all in it together. Mr. Tonasut as purchase money lender, never a member of the LLC, and Emil Assentato, a member of the LLC, and Trust *[sic]* Deed Enterprises who took a second that it owned.

So Mr. Brown's theory without pleading facts is that Mr. Tonasut's just in the whole pot together as a general investment scheme. But that's not what the pleaded facts are and as shown by the judicial notice. No facts are pleaded that Mr. Tonasut's a member of the LLC. No facts are pleaded that Mr. Tonasut managed the LLC. The only facts -- fact pleaded are that Mr. Tonasut made a loan for purchase money for the land Atlas bought.

And, Your Honor, a loan secured by business assets, here the land bought by Atlas, LLC, is typically not a regulated federal security.

And the Court also touched on sweat equity, which I addressed particularly in the motion to dismiss for Mr. Assentato, who is a member of the LLC, with Mr. Brown. Only Brown and Assentato are -- and Trust *[sic]* Deed Enterprises are listed members of the LLC.

And the sweat equity case law I found -- and once

again, this is just Emil Assentato and Trust *[sic]* Deed. This is not Mr. Tonasut. Mr. Tonasut has no ownership interest in the LLC.

10:38AM Sweat equity, that someone like the 50 percent owner of Atlas, LLC, Mr. Brown put in as managing member, that's not the sale to him of a federal security. Sweat equity is just what business owners do when they're making an effort to have a business succeed.

10:39AM And then on Mr. Tonasut, the straight lender, sometime after the purchase money loan secured by Atlas, LLC's ownership interest, Mr. Tonasut bought -- bought and paid Atlas for 15 percent ownership interest in this 20-acre commercial property. That's a purchase by Mr. Tonasut, not a security and not part of an investment scheme. It's Mr. Tonasut of record 10:40AM buying a 15 percent undivided interest in the land.

I -- I shift now to Mr. Assentato's motion to dismiss made jointly with Trust *[sic]* Deed Enterprises.

Brown's alleged ownership interest in Atlas, LLC, and Assentato and Trust *[sic]* Deed Enterprises together have 10:40AM the other 50 percent. Our request for judicial notice showed that Mr. Brown -- I don't recall if his pleading laid out their respective interests. But the facts of pleading rather than just a hand grenade of investment scheme they led me down the primrose path of and certainly -- just kind of a cloud of smoke 10:40AM thrown on their route, fact pleading -- is that Trust *[sic]*

Deed Enterprises owned the land before Atlas, LLC, bought it. Trust *[sic]* Deed Enterprises owned the land. And the Court took -- as in the tentative, is taking judicial notice of the grant deed from Atlas, LLC -- pardon me -- the grant deed from Trust *[sic]* Deed Enterprises to Atlas, LLC -- not Mr. Brown; Atlas, LLC -- for which Atlas, LLC, only and not Mr. Brown took out a loan, a seller carry-back, both from -- the promissory note, of which we've requested judicial notice, the promissory note made by Atlas, LLC, to Mr. Assentato and Trust *[sic]* Deed Enterprises.

A purchase money loan, a second to buy land, a secured loan against a business asset, not regarded in case law I found as a federal security. It's a purchase money loan. Mr. Brown didn't pay for an investment contract. Mr. Brown didn't pay for an investment scheme.

THE COURT: Can I just interrupt you for a moment?

MR. HICKMAN: Yes.

THE COURT: So the -- I hear what you're saying with -- with respect to Mr. Tonasut. But the Complaint alleges that Mr. Brown, Mr. Assentato, and Tax Deed Enterprises signed an operating agreement and -- and to form a partnership.

So if you could address -- while I hear what you're saying with respect to Mr. Tonasut, that perhaps the Complaint doesn't have any allegations that Mr. Tonasut or the Trust were part of this operating agreement or this partnership. But can

you address, with respect to Assentato and Tax Deed Enterprises, why the facts as pled in the Complaint do not amount to an investment contract?

10:43AM MR. HICKMAN: To form an LLC in California, which this was, Atlas, LLC, a California LLC, an operating agreement is required. I did request judicial notice of it.

10:44AM It doesn't show the sale of a security to Mr. Brown, and he doesn't plead facts that there is -- it is a sale of a security to him. He is established as the request for judicial notice shows. He was the managing member. He owns 50 percent. Emil Assentato, my judicial notice, at 30 percent. Trust *[sic]* Deed Enterprises at 20 percent.

10:44AM But the -- the Secretary of State's data, which I've requested judicial notice, shows that -- shows that Brown is the managing member. Brown is in control. Brown is in full control.

10:44AM And the sweat equity that an owner puts in is not a security sold to a member of an interest. Mr. Brown didn't himself pay to buy his membership interest from Emil Assentato or Trust *[sic]* Deed Enterprises. He didn't pay to buy it. He led the setup of the LLC.

10:45AM And so on the facts not pleaded or as pleaded, it doesn't show that even participation in the LLC -- or that interest in the LLC is itself a regulated security, defined regulated security that was sold to Mr. Brown because sweat

equity doesn't do it. That's what every working person in a business who's an owner of a business does.

So the LLC itself does not show that there's a regulated security that was sold to Mr. Brown.

10:45AM THE COURT: Thank you.

Was there something further?

MR. HICKMAN: Not unless there are questions, Your Honor.

THE COURT: Okay. Thank you. I appreciate it.

10:45AM Okay. I will hear from you, Mr. Brown.

MR. BROWN: Thank you, Your Honor.

Federal --

THE COURT: If you could just leave your mask on.

MR. BROWN: I'm sorry.

10:46AM THE COURT: Thank you.

MR. BROWN: Yep. Federal pleading rules require that there is a short and plain statement of FRCP 8. And the spirit of that rule is to -- that the plaintiff make an allegation, that it's considered to be true, not to include

10:46AM conclusionary facts.

THE COURT: I'm sorry. I didn't hear the last part of --

MR. BROWN: Conclusionary facts.

THE COURT: Conclusory facts. Uh-huh. Understood.

10:46AM MR. BROWN: And so when it comes to the 9(b), which

is after 8, and with FRCP 1, the argument -- and I agree with the who, what, when, where, why, how, totally. The -- in respect to the chart that I created for that, you know, I think that it demonstrates key facts that could be explained more. I get that, if they're going to go for a higher pleading standard.

10:47AM

But I think in light of what FRCP 8 says and also the Congress's legislation that, you know, these securities, they're not -- they're not simple transactions.

10:47AM

And so I think that for the pleading, at least, it was to put it very clearly what is -- you know, happened. So --

THE COURT: Can you address Mr. Hickman's argument that, leaving aside the relationship between you, Mr. Assentato, and Tax Deed Enterprises, there's no allegation in the Complaint that Mr. Tonasut or the Tonasut Trust was part of Atlas, LLC, or the operating agreement or anything other than just a simple loan.

10:48AM

MR. BROWN: Well, yes, Your Honor. If you take a look at the -- I mean, and if the -- I'm not sure if this particular document was allowed but -- for judicial notice, but it wasn't -- all the documents he submitted, we were not -- though, I'm not complaining about.

10:48AM

The Tonasut -- in order for this -- the transaction to happen in the sale or purchase of the 15 percent share that

10:48AM

Mr. Tonasut bought, it had to have Emil's signature. He had to sign off on it. And that was -- that was also in the Complaint, that the -- the -- that he was, you know, involved in what we were doing. And, you know --

10:49AM THE COURT: And who do you mean by "he"? Mr. Tonasut?

MR. BROWN: Yeah. Mr. Tonasut and also --

THE COURT: What would you point to in the Complaint as an allegation that Mr. Tonasut did anything more than simply engage in a loan, as Mr. Hickman has described?

10:49AM

MR. BROWN: In the Complaint?

THE COURT: Yes.

MR. BROWN: I don't have it in front of me. Sorry.

THE COURT: Okay.

10:49AM MR. BROWN: I know it's on the page -- because they're in -- they're in -- it will say February 1st, 2022.

THE COURT: Yeah. So there's a timeline.

MR. BROWN: There's a timeline, yes. And so I believe that's the last fact that I have on there.

10:49AM THE COURT: Okay. The timeline says, "On February 1st, 2022, Steve Weera Tonasut Trust acquired a 15 percent undivided interest in the plaintiff's property for $100,000 together with an agreement to delay interest payments on the $179,000 deed of trust until December 1st, 2023. And so

10:50AM Mr. Hickman's argument is that all that shows is a loan. That

doesn't show anything that is like an investment contract.

MR. BROWN: Well, I would say that the -- the argument against that is that in *Howey*, you know, their -- the investment interest, even in those, don't have to be -- and we're talking about investment contracts. You know, he's referring to a security. We -- you know, first thing is: Is this an investment contract before you even get to -- I mean, it makes it a security but --

THE COURT: Right. And he's saying this is not an investment contract. This is just a loan.

MR. BROWN: Yeah. And the argument is that, you know, I was -- it was a common enterprise in respect to that. I was the person and it's documented in the documents that he had submitted, operating agreement, in addition to the fact that the -- the lender -- lender, Weera, could foreclose on the property, obviously, but he chose to buy 15 percent and then I used the 15 percent to pursue the project.

There -- the other element of that is that, even though that, um, the -- you know, it was recorded as public record, you take the transaction as a whole. I mean, that's what we were -- the development project was the investment contract.

And so as to the other elements, you know, there's also those. There's an investment of money. Everyone -- I put 10,000 as stated in the thing. Actually, I put more than that

but just to keep the facts clear for that transaction.

So everyone invested in this common enterprise to get this solar field.  The person who was responsible for it was me.  And, you know, it -- it doesn't matter what the -- I feel, you know, that -- that there are -- you know, just come out and say this is an investment contract.

THE COURT:  I'm sorry.  The last part?

MR. BROWN:  I'm saying that just like -- the investment contract is a judicially created concept, you know, via Congress.  And so that's something that is interpretation, but I feel that all of the elements are met.

THE COURT:  Okay.  And can you address -- the tentative on this -- on this case didn't address it, but the tentative on the Smead case addressed it and I will let you address it at that point, but in case it was helpful to you here.

In the Smead case, we talked -- the tentative discusses the idea that a simple loan under the family resemblance test is not a security.

So I did just -- in light of the argument that Mr. Hickman has made with respect to Mr. Tonasut -- and I understand that it's your reading that the -- under -- applying the *Howey* test, the Tonasut portion of the relationship does constitute an investment contract.  I did want to give you a chance to respond on the -- the idea of applying the family

resemblance test.

MR. BROWN: Well, I mean, on those two, if you look -- I believe in the SEC or its legislation, 1933, it says that any note is a -- is assumed to be a security. Then there's a nine-month exception and, you know, all this kind of stuff.

But with *Reves*, what I -- from how I interpret it is that, you know, you make the assumption that every note is a security and then go from there. Unless it has that nine-month exception and a few other things.

And so what -- when we say "deed of trust" and we say -- I mean, "notes," those are terms that the Congress put in there and doesn't necessarily mean what it says -- you know, what it says as far as the investment contract because you could call a note, like saying I'm holding paper, but yet you're actually -- it's an investment contract because of a series of events or how the transaction transpired.

And so I don't think that this has -- you know, from my understanding, the closer the resemblance of a -- banned ones were actually more -- like, less likely made it a security. And so for me, this is -- it's not, um -- it doesn't meet that test because there's four components of that and --

THE COURT: It doesn't meet the *Howey* test.

MR. BROWN: No. The *Reves*. The *Reves*.

THE COURT: Okay. The family resemblance test.

MR. BROWN: Yes.

THE COURT: Okay.

MR. BROWN: Because there's four factors there. And I don't know if you want me to go through them.

10:55AM THE COURT: No. That's okay.

Okay. Anything further from you, Mr. Brown, on this case?

MR. BROWN: Um, yeah, I just want to, you know, reiterate what an investment contract is. And this is, you

10:55AM know -- someone invests their money in a common enterprise and it's led to profits expected -- excuse me -- profits solely from the efforts of the promoter in this case -- in this count, the plaintiff.

There's also the -- you know, the Ninth Circuit has

10:55AM expanded that a little bit with commonality, I believe vertical commonality. You know, this -- this money was actually pooled all together, you know, from the beginning. So I think that -- that it meets that test of the money that was -- that was pooled together.

10:56AM And then there was additional money that was put into the project as well, via the purchase or sale of the additional 15 percent that was actually from the plaintiff's share.

And then, lastly, I would ask the Court if, in fact,

10:56AM that this is an investment contract, then that is a violation

of federal securities law under *Slack*, 2023. The Court said that any unregistered securities is -- is illegal. And so we want to make it legal.

You know, the investment contract should be registered if it is, in fact, registered. And that could be something that is apart from the 1934 violation because the violation is in regards to 1933 and 1934. So that's what I would ask the Court.

THE COURT: And is that in your Complaint?

MR. BROWN: I -- I believe in the Prayer for Relief, I did put 77. And I didn't put -- I'm sorry I don't have that in front of me. I have everything else.

But, no, I believe it was under the Prayer for Relief or my -- the -- the assumption was that when it's -- I mean, maybe I did not say that correctly. But I did put that if it is, in fact, an investment contract, then that's a security and that's what needs to be fixed.

THE COURT: Okay. Thank you.

MR. BROWN: Thank you.

THE COURT: Anything further, Mr. Hickman? Briefly?

MR. HICKMAN: Briefly, Your Honor.

THE COURT: Thank you. I appreciate it. Please be brief because we do have the two other matters.

MR. HICKMAN: Briefness.

The note. Congress says a note can be a federal

security, but Congress is looking at and the case law shows it's fractionalized interests of notes that are sold to investors. None of these notes are that.

These notes were issued by Atlas, LLC, and Brown, issued by Atlas, LLC, and Brown. And they were not bought by Atlas, LLC, or Brown. No one is alleged to have bought interest in these notes. And so they're not, as a note, federally regulated securities and there's no violation here in these notes.

10:58AM

10:58AM

THE COURT: So you would agree, with respect to Mr. Tonasut, that -- your argument would be that at least the Tonasut's relationship is under the family resemblance test, not a security because it's akin to a normal mortgage contract.

MR. HICKMAN: Correct, Your Honor.

10:59AM

THE COURT: Okay. Anything further?

MR. HICKMAN: I believe the same holds true for what is here on Assentato.

THE COURT: Understood. And I think you appreciate the Court's skepticism with respect to that, but I understand the argument.

10:59AM

MR. HICKMAN: Investment contract for profits, none of these allegations pertain to that. These are notes with -- not based on profits to be repaid by Brown or anyone but notes for a certain amount of money to be repaid at a certain rate. These are not investment contract notes.

10:59AM

THE COURT: Understood. Thank you.

Okay. That matter is submitted. The Court will issue an order on it.

And let's have the parties on the Taylor matter, Brown versus Taylor. Counsel for Clark Taylor.

10:59AM

MR. FANG: Good morning, Your Honor. Jonathan Fang on behalf of Clark Taylor.

THE COURT: Thank you.

Okay. So, Mr. Fang, I trust you received the Court's tentative?

11:00AM

MR. FANG: Yes, Your Honor.

THE COURT: Okay. And, Mr. Brown, since this is your motion, I will let you be heard first. And, again, I thank you for your patience with respect to when the Court was able to put this matter on calendar.

11:00AM

MR. BROWN: Thank you, Your Honor.

FRCP 1 states that these rules should be construed to secure a just, speedy, and inexpensive determination of every action in every proceeding in Federal Court. This is an action and proceeding in Federal Court.

11:00AM

This matter having been before the Court on December 17th, 2022, is a Fifth Amendment takings claim under 42 U.S.C. --

THE REPORTER: Excuse me. Please slow down.

MR. BROWN: Okay. Sorry.

11:00AM

11:01AM This matter is coming before this Court as a Fifth Amendment takings claims -- is that better? -- under 42 U.S.C. against the Los Angeles County Department of Planning is before this Court today to ask for a mandatory preliminary injunction pursuant to FRCP 65, to violate the violation of Fifth Amendment rights, plaintiff's Fifth Amendment rights.

THE COURT: I'm just going to ask you, Mr. Brown, for the sake of the reporter and myself, if you could just slow down just a little bit.

11:01AM MR. BROWN: Oh, okay.

The plaintiff acknowledges that the Government has every right to take property as a function of its sovereignty for the public. But that right is conditioned on just compensation and, thus, there can be no taking without just compensation.

11:01AM

The question the plaintiff brings before this Court is: Should a mandatory injunction be granted in this case? The answer is quite clear that it should be based on the undisputed facts in this case, which makes this a pure and simple question of law.

11:01AM

It's undisputed that the plaintiff brings an inverse condemnation action against the Government for denying the plaintiff's application to install a solar farm on his vacant land in unincorporated Los Angeles County, in violation of the takings clause.

11:02AM

It's undisputed that the defendant has taken the position, the Government -- and I quote from docket -- ECF 43, page 4, lines 12 and 13, quote, "The County has the right to prohibit the construction of residential and commercial structures upon the property."

11:02AM

It is undisputed, as I said, that the Government does, in fact, have this power. But the Government must, in fact, provide just compensation to exercise that right.

THE COURT: Sorry. Mr. Brown, can you point me to where you were reading from? You said ECF which?

11:02AM

MR. BROWN: ECF 43, page 4, lines 12 and 13.

THE COURT: And that is the original opposition?

MR. BROWN: No.

THE COURT: Okay. What is that document?

11:03AM

MR. BROWN: That document is from another opposition for the, I think, deposit of the interest.

THE COURT: Okay. I'm going to look for that.

I was focused on the motion which was at ECF 65, the opposition which was at ECF 71, and the reply which was at ECF 72. But I will look for this other document.

11:03AM

MR. BROWN: Well, it's also in ECF 60 -- or is it -- in the reply as well.

THE COURT: Okay. Can you point me to where it is there?

11:03AM

MR. BROWN: Yeah. It's -- it should be 65. It's on

the first page.

THE COURT: Of the reply or the refiled third motion?

MR. BROWN: The reply.

11:03AM THE COURT: Okay.

MR. BROWN: Um, I have that in a footnote. I'm sorry. And actually, that could be in ECF 63. I'm sorry. That's for -- because that was the proposed order that I did submit.

11:04AM THE COURT: Okay. I guess maybe this is a different way of getting at it. You've indicated that this is a pure question of law.

I guess I thought I heard you say that you agree that the City has the right that it has to bar any structures 11:04AM on the property and your contention is just that they must provide compensation. Is that what you were contending?

MR. BROWN: Yeah. As a sovereign, the public -- for public use, the Government has the right. I mean, that's a basic fundamental principle, that the Government -- and you 11:05AM have to look at *Lutheran*, which is also in Los Angeles County. Even if it was a temporary taking, that compensation is due.

And so that was the -- that's a question.

THE COURT: Okay. And then can you address the arguments made by Mr. Taylor that this is not a taking where 11:05AM compensation is due if you had notice of these limitations in

advance of your purchase? Can you address that argument?

MR. BROWN: Well, I did address that in -- if -- in a reply. I think it's 55, Docket 55. It's also in the -- it's in the proposed order, ECF 63. Yes, I can do that.

11:05AM You know, the -- the opposition -- they cite *Penn Central* as their central claim and *Lingle*. In *Penn Central*, if you -- if you look at a footnote, 118 I think it is -- let me make sure I get it correct for you guys.

There was -- that case is totally different because

11:06AM we're talking about Grand Central Station and we're talking about a historical, you know, landmark legislation that had at least three ways and a procedure to correct the alleged violation as far as them wanting to use the air rights.

And they did say that -- in this that there was --

11:06AM if, in fact, that all economic activity -- because these are folks that they own buildings around it too. So they were taking this as a whole, like, okay, you guys can, like, you know -- you'll be just fine if you don't get the air rights. They said reasonable restrictions. That's one -- 109, Note 5,

11:07AM in *Penn Central*.

THE COURT: And so, Mr. Brown, do you -- I'm not clear on -- do you disagree that -- assuming you were aware of the limitation in advance of your purchase, that that would mean that the prohibition is not a taking? Do you disagree?

11:07AM MR. BROWN: I disagree with that. I mean, I --

THE COURT: Okay. And on what basis?

MR. BROWN: I know in *Lucas*, you know, there was all that regulation. And, you know, the Supreme Court had that caveat of, well, okay, if -- if -- you know, it was in the title before.

11:07AM

But one thing about *Knick* -- and I think that's really where everything stands upon of how this law has changed -- is that, you know, it establishes that -- the federal Constitution says what property rights are in light of state law. But a state or county cannot put on a limitation and appropriate property and then just say that it is.

11:07AM

THE COURT: And so do you -- so if I -- I just want to make sure I understand you correctly. It sounds like you acknowledge that under *Lucas*, if you were aware of the restriction prior to your purchase, that would not be a taking. But you believe that *Knick* has changed that -- the state of the law with respect to that issue?

11:08AM

MR. BROWN: Yeah. And *Lucas* was --

THE COURT: Do I have you correct?

MR. BROWN: Yes. Yes, pretty much. Yeah.

11:08AM

THE COURT: Okay. Okay.

MR. BROWN: And I think in addition to that, if you look at *Tyler* -- and now that we have these cases that are coming before -- in the 42 U.S.C. 1983, *Tyler* made -- I think made clear that, once you have a plausibility of a complaint,

11:08AM

that there has been a taking and just compensation is due. That's on page -- that's *Tyler* opinion -- I just wrote it down this morning. I'm sorry.

If the Court needs a post briefing, I can --

11:09AM THE COURT: No. That's fine. We can find it.

MR. BROWN: But there's two things because what *Tyler* is saying is that -- I think, is that, you know, these cases are -- I mean, some of them are not cut and dry, some are. But when there's been a taking, that's when the

11:09AM compensation is due. There can't be a taking without compensation.

And in this case, if -- and I think *Tyler* applies too if I end up losing the property because this is about -- this is about preliminary injunction, you know -- then the

11:09AM County will possess the property. They can choose to sell the property or not sell the property. They can choose to remove that regulation easily.

It's noted in the -- it's in Docket 44, note -- or -- it's -- it's the -- ECF 63 is probably the best thing to

11:10AM look at because that's the proposed order so it's like the opposite of one -- but it does tell you, it says "can." It doesn't say -- they're saying that they have to. And then they're saying they will prohibit anything.

And so what I'm getting at is that if, in fact, that

11:10AM they do take it, it seems like I'll be entitled to interest,

the excess value, from *Tyler*, if -- you know, if I follow the procedure, if they have a procedure. I don't know what it is.

Now, it's not going to be at a price that I can utilize the land because I -- you know, because the plaintiff can't use it. I mean, the basics of, you know, law -- of property law especially is who you can keep out and let in, basically.

11:10AM

THE COURT: Can you address the question of irreparable harm?

MR. BROWN: Yes. And I wanted to -- if I could go quickly through the four factors. Is that cool?

11:11AM

THE COURT: Yeah. That's fine.

MR. BROWN: Okay. So that's what I was going to get to.

So the irreparable harm part. You know, we're talking about that the -- you know, when -- when a -- let's see. What's the second one here? Oh, yeah. When a land use regulation does not substantially advance the legitimacy interests or denies an owner all economically viable use of the land, this is a per se taking, as we said in *Lucas*.

11:11AM

11:11AM

The irreparable harm about land is that land is unique. There is no other piece of land that is the same -- that this courthouse is on or my property is on or whoever's property. Each property is unique.

And, you know, there really -- the authority for

11:12AM

that is -- I mean, could be common law, could be common sense, it could be the Constitution. You know, I don't even -- you know, no citation is needed is what I would say.

11:12AM Anytime there's a harm with your property, that's irreparable.

And I would say that the additional harm here is that the County has continued to harm, 37 -- I received a $37,414 lawn mowing tax bill. And I'd just like to note that's half of the -- Census Bureau just came September 12th, 2023.

11:12AM The median income in the United States is 74,828.

So -- and I used to mow lawns as my first job. So if they want to pay me to mow my lawn, I'll save the taxpayers money.

That is a tax. They said that it was taxed. They

11:13AM said that, then, if that tax doesn't get paid, which I'm not paying it, then that goes to your personal tax liability.

And so this -- I don't -- and if you look at the -- you know, and I -- and I submitted it under -- you know, I wish opposing counsel would confirm the validity of that document

11:13AM because it is valid. It is -- but, you know, there's other ways that we can figure that out.

THE COURT: I'm sorry. Which document?

MR. BROWN: The document -- the tax -- the mowing -- the weed maintenance letter.

11:13AM THE COURT: Okay. What we refer to as the nuisance

letter?

MR. BROWN: Yeah. The nuisance letter, yes.

THE COURT: Okay. Thank you.

MR. BROWN: And so that is another -- I mean, so we have that. Um, you know, losing the property, that's one thing.

I mean, another thing is that they've already flat-out said that they'll prohibit any structure, even though they -- they can choose not to. So the harm here, too, is that, once they get property, then, you know, they could sell it to whoever, you know, or keep it and maybe possibly I would get the excess, you know, because of *Tyler*.

So the property is just there.

Also, again, another $40,000 tax bill in the mail. So it's like $70,000-some in taxes. And, you know, what are you supposed to do with that?

So I think a right to land is -- and this goes back to the 1800s. 1823, in the *Green v. Biddle* case, and this was, you know, prior to the -- you know, the statute they were talking about, you know, 42 U.S.C. But it's about the Constitution, you know. The right to land essentially implies a right to the profits from it since, without the latter, the former can be no value. Thus, a devise of the profits of land or even a grant of them will pass a right to the land itself.

They have everything but title, but they do have

title. There's no difference. The -- their claim is that, oh, we can just take someone's -- someone's constitutional right that -- that maybe another owner gave us, has said that, and then just pass that on to the next. And then we'll decide whenever we decide to, you know -- to let that go.

11:15AM

And with the solar facility, you know, what I tried to do, because I'm in solar, is to -- these are temporary structures. These aren't -- I mean, the IRS doesn't even consider this a structure for depreciation. And the way that the tax system works, that is, you know, in solar.

11:16AM

So even going in the middle and then -- you know, it was one of the arguments, is it's not a structure but failed -- it's clear that it's fruitless. There's -- there's nothing that they have told me that I could do to that land except pay taxes and a $37,000 lawn mowing bill that I had a week notice.

11:16AM

So I think that -- my thing is what more irreparable -- I mean, what's down the line, you know? And so that, to me, is irreparable harm because I can't do anything to my property, if that answers the question.

11:16AM

THE COURT: Thank you.

Okay. Did you have anything else you wanted to share before I turn to Mr. Fang?

MR. BROWN: I just -- if I could just address the other two real quick, just --

11:17AM

THE COURT: Yes.

MR. BROWN: Irreparable harm is there that I had just mentioned.

The -- not No. 2, sorry. 3, the balance of equities. And I really do think they tip strongly in the plaintiff's favor.

11:17AM

The Government has unlimited resources, multitude of lawyers. I think they have 12 lawyers on this case, you know, to ride this action out until there's nonpayment of taxes or, you know, now auction block was, you know, mentioned.

11:17AM

And I think, fourthly, that this -- this will prove to be a favorable judgment down the line? Well, yeah, maybe if I'm able to succeed in this taking claim, yeah, I get the money that I'm entitled to under the Constitution. But in the meantime, you know, the irreparable harm is I can't use my property.

11:18AM

And then, lastly, with the public, you know, I think the public interest is really important here because, like I mentioned, they have 12 lawyers on there. They have 300 lawyers down there at the County and they had to hire an outside firm against me. I'm not saying that I'm all that good, but I'm just saying that, like, you know, this costs the public money, and especially as -- if you see that the interest rates have went up.

11:18AM

And so my thing is I want to meet in the middle and be reasonable, but they're not trying to be reasonable.

11:18AM

And so I have to do something to my property. And so like I said, you know, I have to do what's right for me.

And so I think those four elements have been met. And thank you, Your Honor.

11:18AM THE COURT: Thank you. I appreciate it.

Okay. Mr. Fang.

MR. FANG: Good morning, Your Honor.

THE COURT: Good morning.

MR. FANG: I think it's very simple, as your

11:19AM tentative laid out. Plaintiff cannot prove with admissible evidence that he did not know that there was an SEA designation that blocked solar farms. He's trying to kind of dance around the fact that, um, when he bought the property, there's evidence that there was SEA designation through the public, but

11:19AM he also has notice of this as well.

In the separate case that's also related, in the Assentato, he claims that -- let me see -- he states that he purchased the property on December 18th, 2020. Prior to that, it also states that the operating agreement between him and

11:20AM Assentato would go towards the --

MR. BROWN: Excuse me, Your Honor. Is this allowed?

THE COURT: I'm sorry. Just a moment. Yes?

MR. BROWN: Is this an objection that's allowed to cross to another case?

11:20AM THE COURT: No. You can respond when I turn back to

you. Thank you.

MR. FANG: It shows evidence, he says, that the purpose --

THE COURT: I'm sorry. Just to be clear, I don't think there's anything improper about Mr. Fang pointing to something that has been publicly filed, which is, I'm assuming, what he's doing.

MR. FANG: Yes, Your Honor.

THE COURT: Okay. But I will give you a chance to respond to it, Mr. Brown.

MR. FANG: Right. I'm referring to the Complaint in the Assentato case.

It says on October 22nd, 2020, they entered into an operating agreement that stated the primary purpose of the partnership was to provide capital for the entitlement and the re-zoning of the property located at 27250 Agoura Road.

He was already aware of the fact that there was a prohibition against solar farms. It shows here that, you know, they wanted to re-zone the property so it would be allowed to have solar farms.

So I just wanted to point that out.

Like the Court said, there's no evidence that -- even if assuming the -- the SEA designation was made after, that there's no economic viability of his property, other than his own self-serving assertions, there's no proof or admissible

11:21AM
11:22AM
11:22AM
11:22AM
11:22AM

evidence showing that the property can't be used in any other manner but --

THE COURT: I'm going to stop you right there, Mr. Fang, because I thought that the County is also of the view that he is prohibited from putting any structure on the property.

MR. FANG: No. I believe the title said the County can restrict any, but it doesn't say that it does restrict. And then the restrictions are through the public ordinances and -- and, like, for example, the SEA restriction against the solar farm.

THE COURT: Okay. So if I understand you correctly, as I wrote it in the tentative, my understanding was that there were two bases upon which Mr. Brown could allege a taking. One was the SEA designation, and the other was the County's right to prohibit any use.

But if I now understand you now correctly -- and I will also confirm with Mr. Brown -- your position is that the County has this sort of baseline ability to prohibit a use and it does that via zoning and the regulations. And in this case, it did it through the SEA designation. So they're not two separate prohibitions.

MR. FANG: Right.

THE COURT: Okay. And so your contention is that he hasn't shown that he has been prohibited from doing anything

besides building a solar farm.

MR. FANG: Right. And also what Your Honor also mentioned, even if the -- it was a blanket restriction, he hasn't proven that the restriction was not made through any other common law or other reasons.

11:23AM

THE COURT: Okay. But now that's kind of like -- I see it as a little bit of a hypothetical situation that we're not facing because the only restriction that you claim currently applies is the SEA designation.

11:23AM

MR. FANG: I'm not claiming that's the only restriction.

THE COURT: Okay.

MR. FANG: But that's the only restriction that -- that has been brought to matter --

11:23AM

THE COURT: Okay.

MR. FANG: -- at this time, Your Honor.

THE COURT: Understood. Okay.

Anything further?

MR. FANG: No, Your Honor.

11:23AM

THE COURT: Okay. Thank you.

Mr. Brown.

MR. BROWN: Thank you, Your Honor.

The public record shows and that -- showed multiple times that do -- not just a solar field on this property but there's been other things, but --

11:24AM

THE COURT: And is that in your Complaint?

MR. BROWN: No. So I just -- yeah, what also was in the Complaint that they now say they can but in the briefings, ECF 63, twice, they said that they have the right.

So this is new information to me that now, oh, I mean, if you read the language, yeah, it says "can." I mean, that's -- but there's never been any -- well, they've always said what they said in court here, you cannot put structures.

THE COURT: Okay. I think I understand the parties' argument. And so this matter is taken under submission.

And we will hear from the parties on the Smead matter. Thank you.

MR. BROWN: Thank you.

MR. FANG: Thank you, Your Honor.

THE COURT: Okay. And so is Mr. Smead himself present in the courtroom?

Okay. Thank you, Mr. Smead. And then --

Okay. Mr. Smead, I will allow you just -- just so that we can sort of work out this housekeeping, maybe you can take the podium briefly. I just wanted to -- and I'm only doing that so that we can all hear you through the microphone.

So -- and when I stated this before, it was not on the record so I do want the record to be clear. The Court was made aware this morning of a late request by your attorney to appear via Zoom. The Court -- this Court's procedures are that

any requests by -- for an appearance via Zoom must be made the Friday before and counsel needs to meet and confer with the other side and indicate what the other side's view is on the request for Zoom.

11:25AM And so when I -- when I looked at the Zoom request this morning, it was, first of all, late and, second of all, did not indicate that your attorney had spoken with Mr. Brown. So we didn't grant the request.

However, my clerk advised me that he spoke with you and you indicated that your attorney was downstairs, he believed he had COVID and wasn't sure how to proceed.

11:26AM

And so I advised the clerk to reach out to your attorney via e-mail to let him know that, under the circumstances, the Court would grant the late Zoom request because we did not want somebody who suspects that they have COVID to come into the courthouse or the courtroom.

11:26AM

But my clerk has advised me that it does not appear that Mr. -- your attorney, Mr. Young, is on the Zoom. So I don't know if you're able to shed any light on what happened or where Mr. Young is at the time -- now.

11:26AM

MR. SMEAD: Yes, Your Honor, I can --

THE COURT: Okay. Thank you.

MR. SMEAD: -- shed some light on the circumstance. Yesterday, he got the diagnosis.

11:26AM THE COURT: Okay.

MR. SMEAD: So I spoke with him and said, well, what do you want to do? And he said, well, I'm going to attempt to, you know, do it via Zoom. And I said, well, I don't think you've got enough time at this point, even though you only knew yesterday that, you know, he was --

11:27AM

THE COURT: And something I should say for the record, because I think this is important, the Zoom request did not indicate that counsel had COVID.

MR. SMEAD: Oh.

11:27AM

THE COURT: So the Court would have -- had that happened, the Court would have handled this very differently. All the request said was that counsel was requesting to appear via Zoom. Because it was late and because he didn't consult with Mr. Brown and there didn't seem to be any emergency and his address, we could see, was local, that's why we didn't grant it.

11:27AM

MR. SMEAD: I understand.

THE COURT: Yes. Okay.

MR. SMEAD: That was apparently a failure on his part, more specific in his --

11:27AM

THE COURT: Request, yeah.

MR. SMEAD: -- his request.

So I told him that I would come down for this hearing and that he could -- if he didn't hear from the Court, that he could probably just do an audio connection.

11:27AM

Now, I don't know if that's still possible, if he has a phone. Can you call his phone and talk to him and --

THE COURT: I guess my concern is he hasn't responded to the e-mail that we sent.

11:28AM MR. SMEAD: He's here.

THE COURT: He's where?

MR. SMEAD: He's here.

THE COURT: What are you pointing to?

MR. SMEAD: Well, downstairs or someplace. He -- 11:28AM they told him to not come in the courtroom.

THE COURT: Does he not have access to his e-mail on his phone?

MR. SMEAD: I don't know, Your Honor.

THE COURT: Okay. So let's take a brief recess. 11:28AM We've already gone quite long. Let's take a brief five-minute recess.

This was what I was trying to avoid, by telling you this before we started the hearing an hour ago, because I didn't want there to be any confusion. But I'm willing to take 11:28AM a five-minute recess for you to attempt to reach him by phone so that he will look at his e-mail and get on the Zoom via his phone.

Mr. Brown? Yes.

MR. BROWN: I just -- on the record that both 11:28AM parties did waive oral argument, just so you know.

THE COURT: Okay. Thank you.

So we'll take a five-minute recess, and you'll try to reach your attorney.

MR. SMEAD: Sure.

11:29AM THE COURT: Thank you.

THE COURTROOM DEPUTY: All rise.

(Break taken.)

THE COURT: Okay. We are back on the record. And we're on the record in the Brown versus Smead matter.

11:52AM And I see Mr. Smead is in the courtroom, and I believe this is his counsel on the Zoom.

Counsel, if you could just identify yourself for the record.

MR. YOUNG: Good morning, Your Honor. My name is 11:52AM David Young. I am counsel for Steve Smead who is the defendant in this case.

THE COURT: Okay. Thank you.

And I do want to thank you for accommodating this. My hope was that you would be outside of the courthouse because 11:52AM I don't really think it's safe for you to be in the courthouse if, indeed, you have COVID. But let's just try to handle this quickly.

And I also understand that the parties -- Mr. Brown has advised me that the parties originally waived oral 11:52AM argument.

Mr. Young, did you receive the Court's tentative ruling?

MR. YOUNG: I -- I did, Your Honor.

THE COURT: Okay.

11:52AM MR. YOUNG: And --

THE COURT: And -- and as I explained to Mr. Smead, the reason why your request for Zoom was not granted was because it was late and you didn't indicate that you had consulted with Mr. Brown. Had your request indicated that you 11:53AM requested the Zoom because you had COVID, we would have happily granted it.

Do you need to be heard -- now that you've seen what the Court's tentative is, do you need to be heard on the motion?

11:53AM MR. YOUNG: I would just like to say a few things, Your Honor.

Your Honor, I did send an e-mail to the court clerk explaining that I did have COVID. I only found out about --

THE COURT: Mr. -- Mr. Young -- Mr. Young, let's not 11:53AM go back and forth on this. I think what the issue may be the normal clerk is out, and that's why we always advise counsel to send their e-mails to the chambers e-mail address.

So if you were e-mailing Ms. Davis directly, she is out and so we wouldn't have gotten those e-mails.

11:53AM MR. YOUNG: I e-mailed her yesterday.

THE COURT: Excuse me?

MR. YOUNG: Your Honor, I only found out about it yesterday, and I e-mailed Ms. Davis yesterday.

THE COURT: And what I'm saying is that if you e-mail Ms. Davis directly and she doesn't happen to be here, we don't get those e-mails. So in the future, if you need to reach the Court, you need to e-mail the chambers e-mail address that is on my website.

MR. YOUNG: All right.

THE COURT: Okay. So.

MR. YOUNG: Thank you, Your Honor.

THE COURT: Thank you.

Do you need to be heard on the motion?

MR. YOUNG: Only one thing, Your Honor, perhaps on the emphasis on things. I'm sure that they're -- from what I've heard, the issue of what is a security has been crashed over again and again.

What I would like to ask the Court to consider is the injuries that Mr. Brown is complaining about. They are not securities laws injuries. They are something outside of them. They are injuries that are basically common law, either breach of tort -- tort, breach of contract, breach of fiduciary duty, but not injuries that the securities laws were enacted in order to -- in order -- in order to redress wrong.

And it seems to me that is a fundamental flaw of

Mr. Brown's case. And I would ask the Court to just think about that for a short time and take that into consideration in issuing its final ruling.

THE COURT: But you would agree I don't need to reach the injury issue if I find that that -- the transaction was not a security and you --

MR. YOUNG: I would agree.

THE COURT: The motion could be granted on that basis.

MR. YOUNG: Yes, I would agree. I would agree with that on the -- I would agree with that, Your Honor. If Your Honor finds that this action is not a security, you do not have to reach the injury issue.

THE COURT: Okay. Thank you.

Mr. Brown, let me let you be heard.

MR. BROWN: Thank you, Your Honor.

Congress passed the securities laws to regulate a largely unregulated market. History -- this is post, you know, the Great Depression. And the -- they did not create -- and I agree -- a federal cause of action for every, you know, common law that exists.

However, Congress did -- and the precedence has shown from *SEC v. Howey* to -- I mentioned *Reves* and others that what an investment contract is.

And going back to what -- and I think this --

addressing the four -- from the tentative ruling, the four items in *Reves*, I just wanted to -- if I can address those, please.

11:57AM On the family resemblance, this is where I think that we get caught up in the, you know, what is it called and -- sorry. Let me find this real quick, wherever it went.

I'm sorry. I'm trying to find this.

Okay. I'll just go through the four parts that I know.

11:58AM So, first of all, it's like what was the transaction about? You know, what was the purpose of it? And as alleged in the Complaint, this was funding an investment opportunity -- investments. The only way that the plaintiff could make payments or make money was for the project to be successful.

11:58AM The second one on the --

THE COURT: Sorry. You mean the only way for the defendant, Mr. Smead?

MR. BROWN: Sorry. The only way that the plaintiff would -- could pay --

11:58AM THE COURT: Mr. Smead.

MR. BROWN: Yeah. Is for -- was depending on the success of the project.

THE COURT: Got it.

MR. BROWN: And that's also one of the key tenets of *SEC* -- of *Howey* because an investment of money -- and I also

11:58AM

invested my own money -- into a common enterprise.

It's in the record, I mean, that we had voluminous exchanges. And even though there may not have been a -- an -- a so-called recorded interest, maybe, you know -- and *Howey*'s immaterial if they're written or it's -- part of a bigger context, undoubtfully he was part of the common enterprise.

And I was the person -- the plaintiff was the person who was solely responsible for the developments. And the so-called loans over the course of different periods, I feel it constitutes one transaction as an investment contract because of those factors.

I don't think it's a resemblance because, like I mentioned before, the -- the note, you know -- in the securities legislation, I believe it's in the -- well, both 19 -- 1933 and -34 basically mean the same. It's a little -- worded differently, but I think the Courts have said they're the same. And both of those say about notes.

Well, undoubtedly when you -- your mortgage is a note. And the -- they're assumed to be securities. Now, just because it was called "deeds of trust" doesn't mean that -- it was the deeds of trust, as the Court understood it. And I agree that it goes to the third party, they're the person that holds the trust.

The note, um -- he -- you could say he took the note or I gave -- you know, that, I don't think, matters. It's not

the name of it. It's what happened.

Um, so with the family resemblance, again, I think that you had to have -- it wasn't a mortgage on a home.

Now, I do understand that the allegation of -- of building a home -- and I did put that in the Complaint. That was ultimately -- yeah, it was a goal. The -- however, it was an investment to -- well, the loan was for -- or the money, you know, it was forewarned, was for that. But if I wasn't able to, you know, live there or something, I'd have to sell it to, you know, pay the -- the bill.

And so it wasn't -- because I understand the home thing. I understand that. And -- but it wasn't -- it was a development project as well. And it was in my business, with what I do.

And then we have, um -- or a lien on business assets. It was all in my name. The defendant wanted it in my name. You know, that could be explored more. But I -- I don't -- you know, I'm looking at the whole picture.

Plan of distribution. Well, the only way that he's going to get the money is if I'm successful with my projects. And he gave multiple extensions. And as -- in the allegation, I mean, that -- you know, in the Complaint, you know, those are provable facts. That's what happened.

I think the reasonable expectations of the investing public is that, when you build -- you have a fiduciary -- or

semi-fiduciary relationship with someone who you trust and that says they have more money than they know what to do with, that -- and you continue to work on a project that you don't think is going to be yanked from you, I think there should -- I think federal securities laws do cover that because common law and -- in the state of California -- I mean, in most states, there are no alternatives for, you know, really looking at this as a whole picture.

I mean, blue sky law is fine. But this is a very particular, I think -- investment contracts that, you know, Congress really -- you know, just like the decisions -- there's many, many ways people make money and they transfer money and they make these creative deals and this is one of them.

And so the -- this is the bigger picture is that that's that.

Sorry. Lastly, I don't think another regulatory body could -- could do this, could regulate this, as I mentioned. You know, this arguably could be a federally insured transaction, as mentioned in one of the briefs, based on the Dodd-Frank law. However, the -- that regulatory body is more concerned with, um, mortgages and this is -- these were investments. And that -- that law, you know, was after the 2008 crisis.

So thinking of two different sets of laws and their purpose, even though the 2010 added to the securities.

So, yeah, I think that that's what it is. You know, and I feel strongly about that because of the facts. And I believe that I can prove it in court.

THE COURT: Understood. Thank you.

12:04PM MR. BROWN: Thank you.

THE COURT: Okay. I don't think I need to hear anything further from you, Mr. Young.

Did you want to be heard further?

MR. YOUNG: No, Your Honor.

12:04PM THE COURT: Okay.

MR. YOUNG: Um, I'll end it right now.

THE COURT: Okay. Thank you.

And I am sorry to hear that you're not well. I hope that you get better soon. Please be safe, travel safely. Your 12:04PM situation is a reminder as to why I have everyone in my courtroom wear masks because COVID is still around.

Okay. And with that, the matter is submitted. The Court will issue an order.

Mr. Brown, I believe this case we've also issued our 12:05PM order on the IFP request, so you should be getting that as well.

And I do want to thank the parties and especially the staff for their patience this morning.

Okay. The Court is adjourned. Thank you.

12:05PM (Proceedings concluded at 12:05 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES )
)
STATE OF CALIFORNIA )

I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 9TH DAY OF OCTOBER, 2023.

/S/ MYRA L. PONCE

MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER