CLINTON BROWN, Self-Represented
16821 Edgar Street
Pacific Palisades, CA 90272
clinton@atlasinc.solar
310-487-6453

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON BROWN,<br><br>           Plaintiff,<br><br>   v.<br><br>EMIL ASSENTATO, TAX DEED<br>ENTERPRISES LLC, STEVE WEERA<br>TONASUT TRUST,<br><br>           Defendant. | No. 2:23-cv-02972-MEMF-KS<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Judge:** Honorable Maame Ewusi-Mensah<br>Frimpong<br><br>**Chief Magistrate Judge**: Karen L. Stevenson |

Clinton Brown ("Plaintiff") for its Complaint against Defendants Emil Assentato, Tax Deed Enterprises, and Steve Weera Tonasut Trust (collectively "Defendants"), alleges as follows:

## I. NATURE OF ACTION

### A. Securities – What's in a Name?

1.     The origins of securities regulation in Anglo-American history date back to 1697, when the British Parliament passed the first law to govern stockjobbers and prevent practices that threatened Government stability.[1] The First Congress, when establishing the Treasury Department, incorporated a clause that explicitly forbade officials from using '*insider information'* to gain profit, either directly or indirectly. *See* An Act to establish the Treasury Department, Section 8, 1 Stat. 65, 67 (Sept. 2, 1789); 31 U.S.C. § 329. Before Congress established Federal oversight with the enactment of the Securities Act of 1933 (archived on December 20, 2023 at

---

[1] 'William III, 1696-7: An Act to Restrain the Number and Ill Practice of Brokers and Stock-Jobbers. [Chapter XXXII. Rot. Parl. 8 & 9 Gul. III. p.11.nu.1.]', in Statutes of the Realm: Volume 7, 1695-1701, ed. John Raithby (s.l, 1820), pp. 285-287. British History Online [http://www.british-history.ac.uk/statutes-realm/vol7/pp285-287] (accessed 21 December 2023).

https://perma.cc/2KZW-VL8K) and the Exchange Act of 1934 (archived on December 31, 2023 at https://perma.cc/2KZW-VL8K) individual states managed securities regulation through what were known as 'Blue Sky' laws. These laws were named to describe speculative investments that had no more basis than so many feet of 'blue sky,' harking back to the unfounded 'Flying Ships' featured prominently in the 1720 London play 'Exchange-Alley.[2] See also; *Hall v. Geiger-Jones Co.,* 242 U.S. 539, 37 S. Ct. 217, 220-221 (1917).

2. [It was] well-settled by the mid-1800s, and indeed earlier, was the specific property interest retained by a landowner when land served as security for a debt.[3] That interest was what Lord Hale had said it was, namely equitable title; and that interest was an interest in property like any other. In 1843 the Supreme Court nicely summarized the creditor and debtor's respective property interests when land served as security for a debt, particularly in the instance of the debtor's default. "According to the long-settled rules of law and equity in all the states whose jurisprudence has been modelled upon the common law," the Court wrote, "legal title to the premises in question vested" in the creditor upon the debtor's default; yet the landowner still held "equitable title" to the property. *Bronson v. Kinzie*, 42 U.S. 311, 318 (1843). To "extinguish the equitable title of the" debtor, the creditor was required "to go into the Court of Chancery and obtain its order for the sale of the whole mortgaged property (if the whole is necessary,) free and discharged from the equitable interest of the" debtor. *Id.* at 318–19. The sale, moreover, was required to be a public one. *See* Thomas M. Cooley, A Treatise on the Law of Taxation, Including the Law of Local Assessments, 489 (1886). Under those same long-settled principles, the debtor would then be entitled to any surplus proceeds from the sale, which represented the value of the equitable title thus extinguished. *Resolution Trust Corp*., 511 U.S. at 541

3. *But that proposition*, as shown above, overlooks the very reasons why a property owner has a right to the surplus. That right does not arise in a manner akin to quantum mechanics,

---

[2] Banner, Stuart, Anglo-American Securities Regulation: Cultural and Political Roots, 1690–1860, pp. 48-51 (2002).
[3] Nature of Allegations, Nos. 2-4 are primarily adopted from the well-researched opinion by Judge Kethledge from the 6th Circuit Court of Appeals as cited in the Supreme Court's *Tyler* decision on May 25, 2023. *Hall v. Meisner*, No. 21-1700 (6th Cir. Oct. 13, 2022). (cleaned up).

materializing suddenly without any apparent connection to anything that existed before. The owner's right to a surplus after a foreclosure sale instead follows directly from his possession of equitable title before the sale. The surplus is merely the embodiment in money of the value of that equitable title.

4.      The defendants forcibly took [*or will take*] property worth vastly more than the debts the plaintiff owes and fail[ed] to refund any of the difference. "In some legal precincts that sort of behavior is called theft." *Wayside Church v. Van Buren County*, 847 F.3d 812, 823 (6th Cir. 2017) (dissenting opinion).

### B. Investment Contract

5.      The touchstone in defining a security is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court means either capital appreciation resulting from the development of the initial investment, or a participation in earnings resulting from the use of investors' funds. *SEC v. C. M. Joiner Leasing Corp*., 320 U.S. 344, 64 S. Ct. 120 (1943).

6.      A security, as used in the Securities Act, includes commonly known documents traded for speculation or investment and securities of a more variable character, including investment contract[s]. S.*E.C. v. Howey Co*., 328 U.S. 293, 297 (1946). An investment contract is a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party. *Id.* at 298.

7.      The Court perceives no distinction between an investment contract and an instrument commonly known as a security. In either case, the basic test for distinguishing the transaction from other commercial dealings is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 852, 95 S. Ct. 2051 (1975).

### C. Security Laws

8.      Together, the Securities Act of 1933, 48 Stat. 74, 15 U. S. C. §77a et seq., and the Securities Exchange Act of 1934, 48 Stat. 881, 15 U. S. C. §78a et seq., form the backbone of

American securities law. *Slack v. Pirani,* 598 U.S. 759, 143 S. Ct. 1433, 1438 (2023). *Congress* enacted a definition of security sufficiently broad to encompass virtually any instrument that might be sold as an investment. *Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S. Ct. 945 (1990). *Congress* meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face-to-face. *SEC v. Zandford*, 535 U.S. 813, 822, 122 S. Ct. 1899 (2002). The end to which *Congress* intends to accomplish, which is providing robust protections for investors and promoting transparency and fairness in financial markets, is treated as the controlling factor of the law. *A. C. Frost & Co. v. Coeur D'Alene Mines Corp*., 312 U.S. 38, 45, S. Ct. 414 (1941).

9.      Securities laws are meant to be flexible and remedial, not restrictive, to effectively combat fraud. The Acts set higher conduct standards…and *are not limited to common-law fraud doctrines*. (Emphasis added). The equal sharing of risk of error is achieved by using a preponderance-of-the-evidence standard, which doesn't favor any side. *Herman & Maclean v. Huddlesto*n, 459 U.S. 375, 390, 382 103 S. Ct. 683 (1983). Given the broadly remedial purposes of Federal securities legislation, the burden of proof is reasonably imposed on an issuer[4] who pleads exemption. *SEC v. Ralston Purina Co*., 346 U.S. 119, 126 (1953) (citing *Schlemmer v. Buffalo, R. & P. R. Co*., 205 U.S. 1, 10 (1907)); Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74, preamble (1933). Private contracts cannot supersede Federal security laws. *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S. Ct. 1917 (1989). An investment scheme promising a fixed rate of return can be an investment contract and thus a security subject to Federal security laws. *SEC v. Edwards*, 540 U.S. 389, 124 S. Ct. 892, 899 (2004). The investment contract in question also involved communications and instruments across state lines and "even where the offense is local and subject only to state prosecution, [*Congress* has] the power to refuse the mails to those conducting the unlawful intrastate enterprise [where it exists]. *SEC v. Crude Oil Co*., 7 Cir., 93 F.2d 844, 849. (1937).

---

[4] The term "issuer" means any person who issues or proposes to issue any security [investment contract]. Section 3(a)(8), 1933 Act.

10.     The misappropriation theory holds that a person commits fraud "*in connection with*" a securities transaction if a fiduciary uses undisclosed information to their own advantage in a security transaction; it is defrauding the principal by taking exclusive use of that information. *United States v. O'Hagan*, 521 U.S. 642 652-653, 117 S. Ct. 2199 (1997). This action dupes the principal. *Id*. Thus, it is unlawful to use or employ, in connection with the purchase or sale of any security *or any security not so registered*, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, *in connection with the purchase or sale of any security*. Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) (as amended through P.L. 117- 328, enacted December 29, 2022); 17 CFR § 240.10b-5. (2023).

11.     Nonpublic material confidential information is property of the [principal]. *Carpenter v. United States*, 484 U.S. 19, 26, (1987) (citing *Ruckelshaus v. Monsanto Co*., 467 U. 8. 986, 1001-1004 (1984); *Dirks v. SEC*, 463 U.S. 646, 658, n. 10 (1983); *Board of Trade of Chicago v. Christie Grain & Stock Co*., 198 U.S. 236, 250-251 (1905)); *Cf*. 5 U.S.C. §552(b)(4). Therefore, a person who trades *on the basis of material, nonpublic information*, in short, gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public. *Supra, O'Hagan*. There is no question that fraudulent uses of confidential information fall within § 10(b)'s prohibition if the fraud is "*in connection with*" a security [investment contract] transaction. *Id*.

12.     The Defendants had a fiduciary-like relationship with the Plaintiff because the relationship was based upon trust and confidence. *United States v. Kosinski*, 976 F.3d 135, 146, (2d Cir. 2020). In an inside-trading case this fraud derives from the inherent unfairness involved where one takes advantage of information intended to be available only for a [specific] purpose… and not to the personal benefit of anyone. *Id*. The intent of Congress to prohibit "any" transaction that undermines a free and fair market is clear and has been reaffirmed, *iterum et iterum*, since the Acts have been enacted, and before that, in the states' "Blue-Sky" laws. The misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with

access to confidential information. *O'Hagan* at 652.

## II. JURISDICTION AND VENUE

13.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the United States, specifically the Securities Act of 1933 and the Securities Exchange Act of 1934.

14.     Subject matter jurisdiction is conferred by 15 U.S.C. § 77v(a), under the Securities Act of 1933, and 15 U.S.C. § 78aa(a), under the Securities Exchange Act of 1934

15.     Because [Plaintiff] brought a claim under Federal law, there is subject matter jurisdiction. *Bell v. Hood*, 327 U.S. 678, 66 S. Ct. 773, 682 (1946).

16.     Federal subject matter jurisdiction also requires that the plaintiff have standing.[5] A plaintiff will lack standing unless the plaintiff: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defenders of Wildlife* 504 U.S. 555, 560-561 (1992).

17.     Here, there [is] no clear lack of subject matter jurisdiction, the issue was fully briefed and presented to the District Court in a motion to dismiss, and the District Court decided the jurisdictional question.[6] Given these circumstances, as the Third Circuit has observed, "even the issue of subject matter jurisdiction must at some point be laid to rest." *Hodge v. Hodge*, 621 F.2d 590, 592 (3d Cir. 1980) (per curiam).

18.     Last, venue is appropriately established in this District pursuant to 28 U.S.C. § 1391(b)(2), as the property and a substantial part of the events or omissions giving rise to the claim occurred within this District.

## III. PARTIES

19.     Plaintiff Clinton Brown resides at 16821 Edgar Street, Pacific Palisades, California 90272.

---

[5] **Brown has standing**. *See* ECF No. 38 at 14. (original emphasis provided)
[6] **The Court has subject matter jurisdiction**. & **There is federal question jurisdiction**. *Id.*

20.     Defendant Emil Assentato resides at 141 Piping Road, Locust Valley, New York 11560

21.     Tax Deed Enterprises, LLC resides at 2401 Boca Raton Boulevard, Boca Raton, Florida 33431

22.     The Steve Weera Tonasut Trust resides at 20147 Chapter Drive, Woodland Hills, California 91364

### IV. FACTUAL ALLEGATIONS[7]

23.     The land was listed on the open market for $299,000 for two parcels totaling 32.4 acres in Calabasas, CA adjacent to Liberty Canyon and Agoura Rd. ("Property").



24.     This transaction commenced with a Vacant Land Purchase Agreement (VLPA) dated June 25, 2020, between Plaintiff and Tax Deed Enterprises, LLC.

---

[7] Brown adequately pleaded the sale of a security. *See* ECF No. 38 at 16, line 18. (Original emphasis provided). Once the Plaintiff, as in this amended complaint, satisfies its *prima facie* burden under Section 5 of the Securities Act, the burden shifts to the defendants to affirmatively plead an entitlement to the exemption. *SEC v. Canavagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

25.    Text communications from on or around June 23, 2020 – June 25, 2020.



26.    The Defendants are accredited investors per regulations set forth in 17 C.F.R. § 230.501(a) (2023). [8]

27.    The Plaintiff is not an accredited investor per regulations set forth in 17 C.F.R. § 230.501(a) (2023).

---

[8]  17 CFR § 230.501 & 17 CFR § 230.215 attribute the same definition to the 1933 and 1934 Acts. (a) Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person: (5) Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000.

28.     October 22, 2020, Plaintiff, Emil Assentato, and Tax Deed Enterprises LLC signed an operating agreement that stated the primary purpose of the "partnership" was to provide capital for the entitlement and rezoning of the property and facilitate the sale of the two land parcels that would be owned by the partnership. *See* ECF No. 38 at 17, n. 7. ("With the agreement itself now part of the record, and with no challenges as to authenticity").

29.     The October 2020 operating agreement states that the Plaintiff is responsible for all substantive work related to the development of a solar farm project. In contrast, Emil Assentato *agreed* to provide financial backing and consultation services. *See* ECF No. 27 at 12-36.



30.     On December 18, 2020, Plaintiff purchased 32.4 acres of land located at 27250 Agoura Rd., Calabasas, CA 91302 ("Property") for $299,000 from Tax Deed Enterprises LLC ("Seller"), an entity controlled by Defendant Emil Assentato.

31.     Concurrent with the purchase, Plaintiff paid $10,000 in cash to Escrow.

32.     On the same date, Defendant Steve Weera Tonasut Trust recorded a first deed of trust on the Property in the amount of $179,000.[9]

33.     Also, on the same date, Defendant Emil Assentato recorded a second deed of trust on the Property in the amount of $110,000.

---

[9] A "deed of trust" refers to a loan agreement between a property purchaser and a lender where title to the property is held by either the lender or a third-party trustee (as opposed to the purchaser) until the loan is repaid. *See* Deed, Black's Law Dictionary (11th ed. 2019).

34.     The Plaintiff was solely responsible for paying the recorded deeds of trust. *See* "Deeds of Trust" Exhibit.

35.     Weera's intent to acquire the Property is evidenced in a phone conversation with the Plaintiff, (after Plaintiff responded to the following letter to exchange phone information), where Weera expressed such interest if the Plaintiff did not buy it. In other words, from the very beginning, Weera intended to take the Plaintiff's equitable title. Weera said so much in a subsequent phone call with the Plaintiff and said to the effect of, "[i]f Plaintiff wasn't in contract [on the property at that time] I would have bought it himself." However, because it was on the open market, and save for the partnership that was induced by Emil, the wrest for control, unknown to the Plaintiff at the time, would come to be at a later day, *through a squeeze*, no less.



36.     The actions of Defendants are alleged to be part of a larger scheme to gain control over the Property, initially unknown to the Plaintiff.

37.     In fulfilling his obligations under this agreement, Plaintiff procured financing in his individual capacity to fund the development of the solar farm. This funding was essential to the advancement of the project and demonstrates Plaintiff's significant personal investment and commitment to the project's success.

38.     After the rejection of the solar farm application by the County officials, Plaintiff in his individual capacity, initiated legal action against the relevant County official. *Clinton Brown*

*v. Clark R. Taylor, AICP, The Los Angeles County Department of Regional Planning*, Case No. 2:22-cv-09203, (C.D. CA) (2022). This legal action was undertaken solely by the Plaintiff, further evidencing his primary role and responsibility in the development solar farm project.

39.     Despite all this, Plaintiff continued to bear responsibility for the project, relying, *this time*, on Weera's assurance of additional funding to complete the project.

40.     On January 28, 2022, *seeking financial backing*, Plaintiff agreed to transfer 15% of his 50% ownership to Steve Weera Tonasut Trust, with the approval from Emil Assentato and Tax Deed Enterprises LLC. *See* "Deeds of Trust" at 6.



Clinton Brown <clinton@atlasinc.solar>

**Agoura Property**

Weera Tonasut <tonasut@cs.com>                                     Tue, Jan 11, 2022 at 9:11 AM
Reply-To: Weera Tonasut <tonasut@cs.com>
To: "clinton@atlasinc.solar" <clinton@atlasinc.solar>

Clinton,

After talking to you yesterday, I have a lot of faith in your ability to finish this project.  I'm willing to inject the new money ( $100,000 ) to pay off the 2nd TD for you  in exchange of 15% ownership of the land.  Leave the 1st TD alone as it is . You don't have to make payment on 1st TD until it's done.  You can start working on the project right away and I will set aside additional fund for you to finish the project.  Please let me know                     Much success,

Steve Weera Tonasut

41.     On November 11, 2022, Defendant Weera communicated via email, suggesting that Plaintiff must forfeit his share and persuade Emil Assentato and Tax Deed Enterprises LLC to sell the Property to avoid its loss.



Clinton Brown <clinton@atlasinc.solar>

**Agoura Hills Land**

Weera Tonasut <tonasut@cs.com>                                     Fri, Nov 11, 2022 at 7:44 AM
Reply-To: Weera Tonasut <tonasut@cs.com>
To: "clinton@atlasinc.solar" <clinton@atlasinc.solar>

Clinton,                                         To avoid foreclosure expense, I would like to offer way out for us. As of for now I own 15% ownership and Atlas LLC owns 85% ownership and Atlas LLC owes me $200,000 (1st trust deed) Here is the deal--I'll forgive Atlas LLC's loan of $200,000 for the exchange of 70% ownership to me. If that's ok with you, at the end I'll have 85% ownership and Atlas LLC  has 15% ownership and Atlas LLC will be free and clear . After all we still own  the land with the same team going forward.  Please let me know so I will have my attorney draw the paper work  for signing and be done with it before Dec 1 .
                                            Thank you,                                              Steve Weera
Tonasut



*Text Communications from on or around March 11, 2022*

42.     These communications, including prior to and subsequent of, *suggest a strong inference* of fraudulent intent on the part of Defendants to acquire the Plaintiff's equitable title to the Property.

43.     As a result of the transaction failing to be disclosed as an "investment contract," and thus a "security," the Plaintiff bought the Property at the market price of $299,000 for a 50% ownership interest, while also being solely responsible for the development and resale of the solar facility in the common enterprise.

44.     January 2021 — August 2021, Emil Assentato loaned a total of $250,000 for the solar facility application studies to the Plaintiff.



*Text Communications on or around February 2021*

45.     Plaintiff is solely responsible for paying back the loan with interest.

46.     Plaintiff paid monthly interest payments of $1,977.48 to Steve Weera Tonasut Trust on the $179,000 first deed of trust until on or about the end of 2021.

47.     January 2022, The Plaintiff, *seeking financial backing*, ceased making monthly interest payments to Steve Weera Tonasut Trust. (Emphasis added).

48.     On or around the same time, after Emil Assentato *denied financial backing*, an agreement was reached to postpone the monthly interest payment in exchange for 15% ownership of the property that would be transferred to Weera.

49.     The Plaintiff has invested in the project and relied on the promises and obligations of the 'accredited investors' in which the Plaintiff was sold an investment contract, unknowingly, and at the same time, recission is appropriate where an investment contract that is not registered is sold to a buyer without the requirement of scienter.

50.     The sale of this investment contract was carried out without proper registration as mandated by securities law.

51.     Furthermore, rescission of this transaction is warranted under the law, as the sale of an unregistered investment contract to a buyer, in this case, by the Defendants, occurred with scienter, but that is not legally required for a recission.

52.     This situation has led to the Plaintiff's current predicament where the investment contract sold, under misrepresented conditions and promises, has not been realized as per the expectations set by the Defendants.

53.     *After* the initiation of this action, it has come to the Plaintiff's attention that Defendants have engaged in communications that are pertinent to the Plaintiff's claims.

---

**update**

**Eassentato** <eassentato@me.com>                                          Thu, Nov 30, 2023 at 2:36 PM
To: Clinton Brown <clinton@atlasinc.solar>, Clinton Brown <clinton@brownrealtygrp.com>, Clinton Brown
<projects@atlasdevelopmentgroupllc.com>, Clinton Brown <secure@authentisign.com>
Cc: Fred Hickman <fredhickman@gmail.com>

HI Clinton,

I hope you are well and had a Happy Thanksgiving.

I just heard you put the commercial property up for sale. I also heard the commercial property was split into two pieces.

It is impossible to determine from here what is true so please provide an update.

Please also note that no asset can be sold or materially changed without the agreement from the other partner/partners.

Anyway, hopefully everything is good.

Best regards,

Emil

---

54.     These communications, which include phone and email conversations, are currently shielded under the attorney-client privilege due to the Defendants' retention of joint legal representation.

55.     The Plaintiff believes that these communications contain critical information

relevant to the claims asserted herein, including but not limited to, further evidence of misrepresentations, omissions, and fraudulent conduct. (*i.e.* falsified foreclosure recording). *Infra*

56.     The Plaintiff further alleges that full and fair discovery is necessary to uncover the extent of the Defendants' knowledge and actions concerning these violations of Federal law.

57.     Notwithstanding the stay of discovery imposed by the PSLRA during the pendency of a motion to dismiss, the Plaintiff asserts that the Defendants' shared legal representation and privileged communications may have implications for the scope and application of the PSLRA's discovery stay in this matter.

58.     The Plaintiff contends that an exception to the discovery stay may be warranted to prevent injustice or to further the interests of justice and to prevent destruction of evidence.

59.     *In summa*, an investment contract takes the form, *inter alia*, purchase agreements, deeds of trusts, promissory notes, operating agreements, formal and informal agreements, which collectively establish the solar project as an investment contract, thus a security.

60.     Defendants offered an investment contract, aware that the land transfer was not a standard real estate transaction and, instead, offered and sold the Plaintiff a security.

61.     In this case, Defendants employed capital in a common enterprise, relied solely on the Plaintiff's entrepreneurial capital for the generation of profits to pay back the funds, in addition to, an option for a $10 million payout to Defendant's Emil and Tax Deed Enterprises LLC. *See* "Operating Agreement" ECF No. 27 at 13.

62.     Brown, Assentato, TDE and Weera all purchased interests in the Agoura Property, intending to build a solar farm.

63.     To qualify as "strong" within the intendment of § 78u-4(b)(2), an inference of scienter must be more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499 (2007). Rule 9(b) requires that the circumstances constituting fraud be stated with particularity but provides that malice, intent, knowledge, and other condition[s] of mind of a person, *may be averred generally*. The inquiry is whether all of the

facts alleged, taken collectively, give rise to a strong inference of scienter, *not whether any individual allegation, scrutinized in isolation, meets that standard*. *Id.* The Defendants' *willful* undercapitalization of the common enterprise created a situation where the Plaintiff is unable to fulfill financial commitments and as a result has been *squeezed* from the ownership of the property, despite doing all the work on the project. (Emphasis added).

64.   *Last*, after the Court's order to Leave to Amend, dated December 7, 2023 (ECF No. 38), critical developments occurred regarding the Plaintiff's property, *central to his cases*.

65.   On December 15, 2023, the Defendants filed a Notice of Default and Election to Sell Under Deed of Trust (No. 20230884374) with the Los Angeles County Recorder's Office, as detailed in ECF No. 39 at 3-9, posing an immediate threat to the Plaintiff's property. *See* "Deeds of Trust" ECF No. 40-1 at 1-4.

66.   The servicer claims that proper procedure has been followed and that "[t]he mortgage[s] servicer has contacted the borrower in person or by telephone pursuant to California Civil Code §2923.5(a)(2), §2923.55(b)(2) to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure". Thirty (30) days, or more, have passed since the initial contact was made." ECF No. 39 at 7.

67.   The Plaintiff has not spoken, met in person or discussed any options to avoid foreclosure with the servicer nor the other Defendants. The Plaintiff is not in a conservatorship, is not a minor and has not granted anyone the power of attorney. Thus, a false recording.

68.   The actions of the Defendants have put the Plaintiff's property at risk of being auctioned off, potentially before the Plaintiff can argue his Amended Complaint for relief.

69.   This has put the Plaintiff in a precarious position where the risk of losing the property to the Defendants is not just hypothetical, but imminent. This sequence of events has resulted in concrete, particularized harm to the Plaintiff, and the threat of additional harm is looming. *See* ECF No. 39 at 3-9.

70.   **DEFENDANT'S COUNSEL**: "Investment contract for profits, none of these allegations pertain to that. These are notes with -- not based on profits to be repaid by Brown or

anyone but notes for a certain amount of money to be repaid at a certain rate. These are not investment contract notes." *See* ECF No. 36 at 20:21-25, Official Transcript (September 21, 2023).

71.     *What are an investment contract notes?*

## CLAIM I:

## Offer or Sale of an Unregistered Investment Contract in Violation of Section 5(a)

72.     Congress enacted the Securities Act to regulate the offer and sale of securities. In contrast to ordinary commercial principles of *caveat emptor*, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

73.     As in all fraud, the allure of money transcends any agreement, whether written or oral, therefore, Congress provided a remedial path that *only* Congress can provide.

74.     The definition of a "security" under the Federal securities laws includes a wide range of investment vehicles, including "investment contracts." 15 U.S.C. § 77b(a)(1); Securities Act Section 2(a)(1).

75.     Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.

76.     Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, crypto assets, and enterprises that exist only on the Internet.

77.     As the United States Supreme Court noted in *SEC v. W.J. Howey Co*., Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the [sweat equity] money of others on the promise of profits." *Id*. at 299 (1946).

78.     A common enterprise exists wherever there is "horizontal commonality" between the purchaser and a given defendant. Such commonality, moreover, is established if each investor's fortunes are "ti[ed] ... to the fortunes of the other investors by the pooling of assets," and there is

a "pro-rata distribution of profits" earned from these combined assets. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) In essence, the monies were "pooled" together in the investment contract and, through the managerial efforts of the Plaintiff, was expected to generate profits that would then be paid to the Defendants and the Plaintiff, in other words, on a pro-rata basis. *Id*, *Supra Edwards* at 397. Even if there's a "fixed" rate of return, in this case, the pro-rata basis increased when defendants charged a default rate of 5%, even though the Defendants allowed the default to occur. Regardless, the only way to pay back the defendants is through capital appreciation or from the project itself. Thus, an investment contract. Thus, a security.

79.     The scheme, as alleged, is the very disguised public distribution that Section 5 seeks to prohibit. (i.e. an investment contract scheme that is unregistered and sold to a person of the investing public.)

80.     In determining whether a financial interest constitutes an "investment contract," the "expectation of profits produced by the efforts of others" requirement is met when the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise. *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1131 (9th Cir. 1991)

81.     In determining whether a financial interest constitutes an "investment contract," the second prong of the test requires either an enterprise common to an investor and the seller, promoter, or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality). Vertical commonality may be established by showing that the fortunes of the investors are linked with those of the promoters. One indicator of vertical commonality, though by no means the only indicator, is an arrangement to share profits on a percentage basis between the investor and the seller or promoter. *Id.*

82.     Once the Plaintiff, as in this amended complaint, satisfies its *prima facie* burden under Section 5 of the Securities Act, the burden shifts to the defendants to affirmatively plead an entitlement to the exemption. *SEC v. Canavagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006). Defendants will fail to make the necessary showing. Nor is an exemption clear from the face of the amended

complaint. *SEC v. Sason*, 433 F. Supp. 3d 496, 514 (S.D.N.Y. 2020). Proof of scienter, it is well-established, is not needed to show Section 5 liability. *Cavanagh*, 445 F.3d at 11 n.13

83.     The United States has the power, which it exercises through the Securities Act, to deny the use of instrumentalities of interstate commerce or communication, as well as the use of the mails, to those offering investments to the public, whether these investments be good or bad, until their sponsors have complied with the Act by making the disclosures thereby required in the public interest. *SEC. & Exch. Com. v. Bailey*, 41 F. Supp. 647 (S.D. Fla. 1941).

84.     Here the sales were apparently by oral communication, but the transactions were consummated by the use of the mails, which brings the transaction [in purview of Securities law]. *Blackwell v. Bentsen*, 203 F.2d 690 (5th Cir. 1953)

85.     Even where the offense is local and subject only to state prosecution, [Congress has] the power to refuse the mails to those conducting the unlawful intrastate enterprise exists. *SEC v. Crude Oil Co.*, 7 Cir., 93 F.2d 844. 1937

86.     The Plaintiff is entitled to a claim of recission under Section 5 to restore full ownership to the Plaintiff, even if the Court does not find a 10(b)(5) violation in this controversy. A finding of a 10(b)(5) violation would entitle the Plaintiff to damages.

## CLAIM II:

### Violations of 10b-5 'in connection with' the offer or sale of an unregistered security

87.     There is a private right of action for violations of Rule10b-5, which the SEC created to enforce Section 78(j)(b). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–42 (2011). The elements of a violation of Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant(s); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id*. at 141 n.3. *All of which are alleged herein*.

88.     Investigation, including phone and email conversations between the Defendants, (who now enjoy attorney-client privilege, as the parties have the same Counsel), through particularized discovery, is necessary to preserve evidence and to prevent undue prejudice to the

Plaintiff. *See* 15 U.S. Code § 78u–4(b)(3)(B) & (C). It is unclear at this time whether the PSLRA, which stays discovery during the pendency of any motion to dismiss, will be lifted.

89.     To survive a threshold motion to dismiss, [he] must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference. Then to prevail a trial [he] must prove by a *preponderance of the evidence* that it's more likely than not that the defendant[s] acted with a culpable state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (oral opinion announcement by Ginsburg, J., at 5:54–6:14). To qualify as "strong" within the intendment of § 78u-4(b)(2) [of the Private Securities Litigation Reform Act ("PSLRA")], an inference of scienter must be more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499 (2007).  Rule 9(b) requires that the circumstances constituting fraud be stated with particularity but provides that malice, intent, knowledge, and other condition[s] of mind of a person, *may be averred generally*. *Id.* The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, *not whether any individual allegation, scrutinized in isolation, meets that standard*. *Id.*

90.     Such a transaction, where Plaintiff has provided full value for only partial ownership without the anticipated benefits, is unconscionable and may be indicative of misrepresentation and fraud, particularly, where the purchase price did not reflect the proportional ownership interest and, *especially*, where the Defendants are set to misappropriate information gleaned from the Plaintiff to sell the property for a profit. *Supra*, *O'Hagan*.

91.     The term "Federal common law," although it has eluded precise definition, closely mirrors the situation that faces us here: It is court-made law that is neither constitutional nor statutory. *See* Erwin Chemerinsky, Federal Jurisdiction 349 (3d ed. 1999) (defining Federal common law as "the development of legally binding Federal law by the Federal courts in the absence of directly controlling constitutional or statutory provisions"); Martha Field, Sources of Law: The Scope of Federal Common Law, 99 Harv. L. Rev. 881, 890 (1986) (defining Federal common law as "any rule of Federal law created by a court… when the substance of that rule is

not clearly suggested by Federal enactments--Constitutional or Congressional"). *United States v. Enas*, 255 F.3d 662, 674-675 (9th Cir. 2001); 28 U.S.C. § 2201 - Creation of remedy.

92.     SEC. 16 of the 1933 Act states, "*[T]he rights and remedies provided by this title shall be in addition to any and all other rights and remedies that may exist at law or in equity*." [10]

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff demands judgment against the Defendants as follows:

1. Appointment of a temporary receiver under Rule 66 and L.R. 66-1, to prevent the premature seizure and sale of the investment contract (*i.e.* Property);

2. Award the Plaintiff statutory damages, compensatory damages, restitution, disgorgement, and any other relief that may be permitted by law or equity;

3. Permanently enjoin Defendants from the unlawful, unfair and unconscionable conduct alleged herein;

4. Order the rescission of the sale of the unregistered investment contract that the Defendants sold the Plaintiff, so as to restore the Plaintiff's full ownership rights;

5. An award of costs, expenses and Counsel fees as permitted by law; and

6. Such other or further relief as the Court may deems appropriate, just, and equitable pursuant to 28 U.S.C § 2201 or otherwise.

## **DEMAND FOR JURY TRIAL**

The Plaintiff hereby demands a jury trial for all claims so triable.

Dated: January 3, 2024                    */s/ Clinton Brown*, Self-Represented
                                          16821 Edgar Street,
                                          Pacific Palisades, CA 90272
                                          clinton@atlasinc.solar
                                          310-487-6453


CC: All Counsel of Record (via ECF) on January 3, 2024

---

[10] "…and not changing the current treatment of individual lawsuits." *See* Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353, § 2(5), 112 Stat. 3236. *Cf.* The Private Securities Litigation Reform Act of 1995 (PSLRA) Public Law 104-67, 109 Stat. 737 which did not amend Section 16 of the 1933 Securities Act (archived at https://perma.cc/CQ9L-ZH4S) Both litigation reform acts were enacted by Congress to narrow class actions lawsuits, not individual lawsuits, as in this case. *Id.*